[No. B008673. Second Dist., Div. Four. Feb. 5, 1987.]

ANNETTE ANN BALLOU et al., Plaintiffs and Appellants, v.
MASTER PROPERTIES NO. 6 et al., Defendants and Appellants.

COUNSEL

Saul Reiss, Stark & Lorenzo and Nathan M. Stark for Plaintiffs and Appellants.

Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey, Richard D. Williams, Timothy J. Harris, Gideon Mark, Alioto & Alioto, John I. Alioto and Joseph Alioto fo r Defendants and Appellants.

OPINION

**KINGSLEY, Acting P.J.**—The plaintiffs appeal the trial court's grant of a motion for new trial on the issue of damages. The defendants cross-appeal. We reverse the granting of the new trial motion and affirm the judgment.

This case arises from defendants' attempt to defraud plaintiffs out of their real estate broker's commission. The defendants, Richard Traweek and the Traweek Investment Company, Inc. (TIC) are the promoters and managers of a number of limited partnerships. In April of 1978, one of those limited partnerships, Master Properties No. 6, acting through TIC, purchased an apartment building in Brentwood—the Sunset Terrace. The limited partnership paid $4,076,000 for the building which included a 6 percent commission to TIC. Defendant Richard Traweek is president of TIC and 50 percent shareholder in the corporation along with his father, Sherman Traweek. Sherman Traweek, in addition to owning a half interest in TIC, was one of the three general partners in the limited partnership.

Three months later, in July 1978, TIC put the apartment building back on the market for sale. The asking price was $5.7 million, an increase of $1.7 million in three months. At trial, the defendants would claim that this price was simply their net price—that is, the desired return to the limited partner-

ship after any payment of brokerage commissions (other than those to TIC, which would again take nearly 6 percent of the transaction). It was defendant's argument that this net price was part of their "entrepreneurial theory." It encouraged a broker to locate a buyer willing to pay the highest price, as any amount over $5.7 million would belong to the broker.[1]

The principal issue at trial was whether this "entrepreneurial theory" was ever communicated to the plaintiffs, who are the real estate brokers who eventually found a buyer for the property. Plaintiffs claim that they were never told that the selling price was a net price, but rather that they were promised a flat 6 percent commission. The plaintiffs subsequently found a buyer for the property, a real estate developer named Marvin Sobel, who was willing to pay $5.4 million for the building with $1.3 million down in cash. As plaintiff Becky Codron states, at that time: "What happened was I received a phone call from Mr. King [an employee of TIC] that he wanted to come over and discuss the offer with me. He came over sometime the 1st or 2nd of October, and he walked in and he said, 'Becky, I think we can make this deal.' And he said, 'But we have one problem. The limited partners have to have a certain guarantee on their money on their investment, and there's only going to be a hundred thousand dollars for commission,' and I told him, 'What happened to the six percent that we've been talking about?' He said, 'Well, you know, there's only room for a hundred thousand dollars here.' So I said that I would discuss it with Ann, and then I said, 'Are there any other brokers involved here?' And I specifically asked that, and he said, 'No. You're the only brokers. No other brokers involved.' So I said I would discuss it with Ann, but I felt if this is all there was there, you know, it seems to be the only way we could go. So I told Ann what had happened, and we discussed it, if that's all that was in the partnership available and there were no other brokers ever discussed that we would accept a hundred thousand dollars. . . ."

When TIC submitted its formal counteroffer, plaintiffs learned to their dismay that their commission was to be in the form of a note and not in cash. However, this commission too was to be reduced. Plaintiff Ann Ballou described the finalization meeting: "Actually what happened is they went through everything, and they said, Well, okay, now we've agreed on all the

---

[1] How this works to defendants' advantage is a mystery. Since defendants have announced in advance that they intend to take only a certain sum, it could hardly matter to them which buyer was willing to pay the highest price. All prospective buyers would be equal in defendants' eyes as long as they met the net price, regardless of what they were willing to pay over it. This does mean, however, that defendants would not have to pay any brokerage commission if they initially set their net price higher than what the property could sell for. Once an interested buyer was found, the net price could then be reduced to just under what the prospective buyer was willing to pay. Here, TIC set its net at $5.7 million. When a buyer was found for the property who refused to pay more than $5.4 million for it, TIC reduced its net to $5.35 million.

points of the contract, and Mr. Sobel says, 'As far as I'm concerned I'm happy. Are you happy?' And Mr. Traweek said, 'Well, I am, but, you know, there's just one point I have to bring up, and I can't begin to tell you, Annette, how bad it makes me feel to have to talk to you about this because I know how long and hard you and Becky both have worked on this back and forth as far as offers and counteroffers,' and he also went into an elaborate thing about 'I used to be a real estate agent myself, and I know how hard you girls are working out there to put these things together, and if it were up to me personally I'd see that you got every dime of your commission, but I have met with our general partners. There is absolutely no way that we can sell this property under these terms and conditions and still pay you a hundred thousand dollars commission because we have to show our limited partners the return that we have guaranteed them, and that's the return on here which is a million three.' I don't think he gave me a price at that time. He said, 'We have promised them, and under this we can only pay to any brokers $50,000 commission, and I'm sorry. I wish I could give you more, but this is all there is.' "

According to the plaintiffs, Richard Traweek again assured them that no other brokers were taking a commission on the transaction. Plaintiffs were to learn otherwise when, a day before escrow was to close, TIC added a modification to the escrow instructions giving itself $222,000 in commissions as a real estate broker. At trial, TIC claimed that it took real estate commissions in lieu of management fees. On this building alone, for the nine months TIC held the property, it received close to $500,000 in such fees—6 percent of the price when the building was purchased and 6 percent when it was sold.[2]

When plaintiffs learned of this commission, they filed the instant action alleging breach of contract and fraud. According to plaintiffs, Richard Traweek had lied when he told them that no other brokerage commissions were being paid and when he stated that there was an insufficient return to pay the plaintiffs a commission of more than $50,000. Clearly, the plaintiffs argued, the return was sufficient if TIC had been willing to reduce its own commission. The jury agreed with plaintiffs, finding Richard Traweek and TIC liable for fraud and awarded the plaintiffs $138,000 in compensatory damages and $2 million in punitive damages.

---

[2]The profit to the limited partners for the same period appears to have been about a million dollars. In the two years that this particular limited partnership owned properties, TIC received $1.7 million in management fees. In addition, TIC, which had 15 employees including the two partners, managed five other limited partnerships from which similar fees were drawn. These fees do not include the sums necessary for the upkeep and physical management of the property which were handled by another Traweek entity, the Palmer Traweek Management Company.

Defendants then filed a motion for new trial, which was conditionally granted by the court. The court's minute order indicated that a new trial was granted unless the plaintiffs, within two weeks, consented to a reduction of the compensatory damages from $138,000 to $50,000, and of the punitive damages from $2 million to $250,000. The plaintiffs moved for reconsideration and the time to accept the reduction was extended to November 26, 1984. At that time, the court expressed the belief that its earlier order had been ill-considered and that the punitive damages should only have been reduced to $500,000. The court, however, felt itself without jurisdiction to modify the order granting new trial. The court did clarify the order, however, to indicate that a new trial was granted on the issue of damages only, and not on the issue of the fraudulent conduct of the defendants. The plaintiffs declined to accept the reduction and have appealed the grant of new trial. Defendants have cross-appealed. We reverse the order granting new trial and otherwise affirm.

I

██ Plaintiffs' chief contention on appeal is that the order granting new trial should be reversed as the court was late in filing its statement of reasons. Code of Civil Procedure section 657 requires the court to give not merely its grounds for granting a new trial, but the reasoning behind those grounds. If the order granting new trial "does not contain such specification of reasons, the court must, within 10 days after filing such order, prepare, sign and file such specification of reasons in writing with the clerk." (Code Civ. Proc., § 657.) ██ This 10-day period has been held to act as a statute of limitations on the court. (*Mercer* v. *Perez* (1968) 68 Cal.2d 104, 121 [65 Cal.Rptr. 315, 436 P.2d 315].) If a statement of reasons has not been filed within the 10-day period, the order granting new trial must be reversed and the judgment automatically reinstated. (*La Manna* v. *Stewart* (1975) 13 Cal.3d 413, 425 [118 Cal.Rptr. 761, 530 P.2d 1073].) No showing of prejudice is required. (*La Manna* v. *Stewart, supra,* 13 Cal.3d at p. 423, fn. 9.)

██ A statement of reasons was filed in this case, however, on December 6, 1984—10 days after the court hearing on November 26. The issue in this case then is whether the 10-day period runs from the time the new trial was conditionally granted on November 2, 1984, or from November 26—the time that the option to accept the reduction of damages expired and the date on which the court denied the plaintiffs' request to modify the order.

Code of Civil Procedure section 657 is unequivocal on this point. Ten days after *filing* the order granting new trial, the court must file its specification of reasons. Undeniably, the order granting a new trial in this case was filed on November 2, and not November 26, even though the time to accept the

reduction of damages did not expire until that later date. Moreover, the actions of the trial court lead only to the conclusion that it regarded the order of November 2 as having granted the new trial, as on November 26 the court denied plaintiffs' motion to modify the new trial order on the grounds that it was without jurisdiction to do so. If the trial court itself felt that it was without jurisdiction on the 26th, it can only be because it considered the new trial as having been granted on November 2. Indeed, defendant's own position on this issue has been inconsistent. On appeal, defendants contend that the statement of reasons was filed within the 10-day period as the new trial was not granted until November 26. At the time of trial, however, the defendants argued that the new trial order was final on November 2, and that therefore the court was without jurisdiction to modify the order so as to double the punitive damages. We feel that defendants' position at trial is closer to the mark. Even though the new trial order was made conditional, it was granted and filed on November 2, and it is from this date that the 10-day period runs.

At oral argument, however, defendants contended that any failure to file the statement of reasons was invited error, and that the trial court's oral recitation of its reasons on November 2 substantially complied with the requirements of the statute. Neither is the case. Defendant's contention that the plaintiffs "invited" the court's failure to file its statement of reasons by their having moved for modification and for an extension of time in which to accept the reduction in damages, overlooks the fact that this motion was not made until November 13—one day after the last day in which the statement of reasons could have been properly filed. How this invited the court's error —after the court was already in error—is unclear. Nor do defendants fare any better with their argument that the court's oral statement of reasons is sufficient to comply with the statute. In the first place, Code of Civil Procedure section 657 explicitly requires that the specification of reasons be in writing, and in the second, this contention has been resoundingly rejected by the Supreme Court in *La Manna* v. *Stewart, supra,* 13 Cal.3d at pages 419-423. Accordingly, we reverse the order granting new trial in its entirety.

## II

■ The defendants cross-appeal. Their principal contention is that plaintiffs' complaint states nothing more than a right to negotiate. Defendants argue that their misrepresentation did not deprive the plaintiffs of anything, as defendants would not have accepted a cut in their commission even if plaintiffs had known to ask for a more equitable division. As such, they claim their conduct is not actionable as fraud.

This seems to us little different from the classic fraud case of a man who buys what he believes to be a Swiss watch only to later learn that it is a cheap

imitation. The gravamen of his complaint is that, although the watch he purchased is perfectly good, he would not have paid so much for it had he known its true value. We have no way of knowing for certain what price the seller would have accepted for the watch had he been confronted with a buyer who knew its real worth. It is manifestly unjust, however, to permit the seller the defense that the buyer has not been defrauded as he would never have sold the watch for less, since he only sells to suckers. In such a case, the seller would be held to have accepted only the fair market price for the watch, even if he never would have taken it in reality.

Similarly, we have no way of knowing—had Richard Traweek been honest enough not to lie to the plaintiffs about his own commission—whether he would have accepted less. The defendants argue that he would not have. Still, as in the hypothetical above, the jury has the right to determine what a fair price for the plaintiffs' services would have been. Here, the jury concluded that an equal division of commissions was equitable. Considering that, according to the plaintiffs, the defendants had initially promised them the entire 6 percent commission, we do not see this as unreasonable.

## III

The defendants next contend that there is insufficient evidence to support the judgment. According to defendants, there is no evidence of any misrepresentation, that if there was one, it was immaterial, and that it did not result in damage to the plaintiffs in any event. Specifically, defendants contend that they never denied that TIC was taking a commission. They claim that they merely said that there were no other "outside" brokers taking a commission.[3]

The plaintiffs recall things rather differently. According to plaintiff Ann Ballou, when defendant Traweek told her that she would again have to cut her commission—this time in half—she asked him: "Well, Mr. Traweek, you're absolutely sure this is all the real estate commission that you can pay, and you're not paying anyone else? There's no one else going to realize any gain out of this if I lower my commission?" And he said, "Absolutely no way," and he said, "You have to understand we have an obligation and a fiduciary duty to our limited partners, and that is why we're doing it, Sweetheart. We wouldn't want to take it from you to give to somebody else."

This is, however, exactly what Traweek and TIC did. The defendants admitted that prior to this discussion, the exact return to the limited partnership had already been agreed upon by the general partners. Any amount over

---

[3]TIC being, in their parlance, an "inside" broker.

this figure, after closing costs, belonged to TIC. Indeed, even before the finalization meeting, the limited partnership was certain to receive the $1 million return the general partners wanted. The only issue at that meeting was how much TIC would receive. Every dollar cut from the plaintiffs' commission automatically went to Traweek and TIC. Contrary to his statement, Traweek was not simply taking the plaintiffs' money and giving it to someone else, he was giving it to himself. The record is replete with such misrepresentations by Traweek and is more than sufficient to allow the jury to conclude that defendants engaged in a campaign of calculated deception.

The defendants argue, however, that these misrepresentations are immaterial, since: "There is no substantial evidence, and indeed no evidence at all, to establish that Ballou and Codron in any way viewed the issue of TIC's commission as material or significant to their own decision on their commission. Why is it any concern or business of plaintiffs whether TIC receives a commission, or how much? The TIC commission from MP-6 [the limited partnership] had nothing to do with plaintiffs. The existence or the amount of commission from MP-6 to TIC was wholly irrelevant to plaintiffs' decision to either accept the proffered $50,000 commission or reject it."

If that reasoning was even remotely credible, this lawsuit would never have arisen. Aside from being totally contrary to common sense, it is also contradicted by the plaintiffs. Both testified throughout trial that the sole reason they accepted the reductions in their commission was because they believed that no other commissions were being paid. Defendants' fraud then can hardly be held to be immaterial.

Defendants also argue that there is no proof of any damage by the plaintiffs. Plaintiffs, for their part, claim they were promised a 6 percent commission. Plaintiff Becky Condron testified about a phone call she made to defendant Richard Traweek: "I called to ask specifically what the commission was because we had had a meeting in the office when Miss Ballou wanted all this spelled out. She said that I tend to be a little lax in this area, so it was very important that I set it down to be able to discuss it with her. He said it was six percent." As plaintiffs were initially promised a 6 percent commission and ended up with $50,000, the contention that there is insufficient proof of damages must be rejected.[4]

---

[4]The jury verdict of $138,000 essentially splits the commissions on the property equally between plaintiffs and defendants. $50,000 in commission was paid to plaintiffs, more than $222,000 was paid to defendants, and some $3,000 was later refunded by the escrow company and kept by defendants as a commission. This totals over $275,000 which divided evenly equals $137,500.

■ We note that defendants have not appealed the award of punitive damages as excessive. Addressing this issue on our own, we conclude that in light of the entire record, the award of punitive damages is not so disproportionate as to shock the conscience or to indicate that it was the result of passion and prejudice. (*Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910, 927-928 [148 Cal.Rptr. 389, 582 P.2d 980].)

## IV

■ The defendants additionally contend that the judgment must be reversed as the statute of frauds requires that all agreements to pay real estate commissions be in writing. (Civ. Code, § 1624, subd. (d).) This argument would be meritorious if this action were predicated solely on breach of contract. It is not. The principal claim here is fraud. It is now well settled by the Supreme Court's recent opinion in *Tenzer* v. *Superscope, Inc.* (1985) 39 Cal.3d 18, 28-31 [216 Cal.Rptr. 130, 702 P.2d 212], that the statute of frauds is no bar to an action predicated on fraudulent misrepresentation.

## V

■ The defendants raise additional trial error which we address in brief:

(1) The defendants contend that the trial court erred by refusing to allow the defendants to impeach plaintiff Becky Codron with statements in her unverified complaint. It is difficult to see how these were admissible as the witness's prior inconsistent statements since her complaint was unverified and thus contained not her allegations, but only those of her attorney.

■ (2) The trial court did not instruct the jury that it had granted a directed verdict against the limited partnership for the $50,000 commission that it admitted it owed the plaintiffs but had not yet paid. We see no error here as clearly the court's award of $50,000 was not meant to be supplemental to the jury's verdict on the total damages suffered by the plaintiffs. Defendants Traweek and TIC may offset their liability to the plaintiffs to the extent of any payments actually made by the limited partnership.

■ (3) Defendants complain that the court should not have given the jury the optional fourth paragraph of BAJI No. 12.36 on the duty to disclose. The principal paragraph of this instruction reads: "Except as you may otherwise be instructed, where material facts are known to one party and not to the other, failure to disclose them is not actionable fraud unless there is some relationship between the parties which gives rise to a duty to disclose such known facts."

The optional fourth paragraph included by the court states: "A duty to disclose known facts arises in the absence of a fiduciary or a confidential relationship where one party knows of material facts and also knows that such facts are neither known nor readily accessible to the other party."

This is an accurate statement of the law, although not entirely relevant to this case, as the record better supports active falsification rather than a failure to disclose. The evidence is sufficient, however, to present to the jury the issue of whether there was a duty to disclose. We see no error then in the court's having done so.

 (4) Defendants finally contend that plaintiffs' counsel improperly appealed to the passions of the jury. Defendants point out that the court sustained 71 objections to plaintiffs' questions, and that it characterized plaintiffs' closing argument as "an empassioned [*sic*] plea during . . . which she referred to Biblical references, specifically that of Bathsheba, and branded the plaintiffs as poor females against avaricious defendants."

We have examined the record and note that the number of objections sustained appears to be about equal on both sides. So as not to impugn the good name of any of the attorneys, we must point out that none of these objections were made to anything particularly objectionable. As to plaintiffs' closing argument, it is with great trepidation that we would hold quoting the Bible to be misconduct. We see nothing in the argument likely to appeal unduly to the passions of the jury and thus must reject defendants' request for a new trial on all issues.

The order granting new trial is reversed. In all other respects, the judgment is affirmed. Plaintiffs to recover costs.

McClosky, J., and Arguelles, J., concurred.

A petition for a rehearing was denied March 6, 1987, and appellants' petition for review by the Supreme Court was denied April 23, 1987.