Joan HANGARTER, Plaintiff,

v.

THE PAUL REVERE LIFE
INSURANCE COMPANY,
et al., Defendants.

No. C 99–5286 JL.

United States District Court,
N.D. California.

Nov. 12, 2002.

89. Interest on the reduced award of punitive damages shall accrue from September 24, 1996, in accordance with 28 U.S.C. § 1961.

Ray Bourhis, Jill K. Schlichtmann, Alice J. Wolfson, Bourhis Wolfson & Schlichtmann, San Francisco, CA, Daniel U. Smith, Daniel U. Smith Law Offices, Kentfield, CA, for plaintiff.

Horace W. Green, Lori K. Bernard, Barger & Wolen, LLP, San Francisco, CA, Evan M. Tager, Mayer Brown Rowe & Maw, Washington, DC, for Paul Revere Life Ins. Co., UnumProvident Corp., defendants.

### ORDER DENYING JUDGMENT AS A MATTER OF LAW OR NEW TRIAL

### FINDINGS OF FACT AND CONCLUSIONS OF LAW FINDING VIOLATION OF CAL. BUS. & PROF. CODE § 17200

LARSON, United States Magistrate Judge.

### INTRODUCTION

Defendants' Motion for Judgment as a Matter of Law or for a New Trial came on

for hearing on June 5, 2002. Appearing for Plaintiff were Ray Bourhis, Alice Wolfson, David Lilienstein, and Daniel U. Smith. Appearing for Defendants was Horace Greene and Evan Tager, who participated by telephone from Washington, D.C. After reviewing the parties' extensive briefs and the record in this case and hearing oral argument, the court concludes that Defendants' motion should be denied. The jury's verdict was based on substantial admissible evidence of Defendants' bad faith breach of the insurance contract with Plaintiff, including evidence that Plaintiff was totally disabled under California law, that Defendants conducted a biased investigation of her claim and that her benefits were wrongfully terminated. The court committed no prejudicial error by admitting or excluding either evidence or witness testimony or in the jury instructions. The verdict reflected the weight of the evidence. The awards for compensatory and punitive damages were legally sound and not excessive. The jury awarded attorney fees after proper instruction by the court according to the California Supreme Court's holding in *Brandt*.

The court also hereby issues its findings of fact and conclusions of law with respect to Plaintiff's cause of action under Cal. Bus. & Prof.Code § 17200, the Unfair Competition Act. The court finds that the same actions which led to the jury verdict in this case constitute violations of § 790.03 of the California Insurance Code, the Unfair Insurance Practices Act. Further, the jury found, and this court agrees, that Defendants acted in bad faith. Consequently, Defendants have also violated § 17200 and the court enjoins Defendants from committing any further violations.

### BACKGROUND

After eleven days of trial, on February 4, 2002, a jury of six men and one woman returned a unanimous verdict for plaintiff Joan Hangarter against Defendants Paul Revere Life Insurance Company and UnumProvident Co. The total awarded was $7.67 million, including $5 million for punitive damages, $1,520,849 for past and future unpaid benefits, $400,000 for emotional distress and $750,000 for attorneys' fees. Defendants filed a motion to overturn this verdict, for judgment as a matter of law ("JMOL") or for new trial.

The jury made the following findings in the Special Verdict:

1. After May 21, 1999, the date her benefits were terminated by Defendant, Plaintiff was unable to perform the substantial and material duties of her own occupation in the usual and customary way with reasonable continuity;

2. Plaintiff is entitled to recover her past benefits, up to the present day, as a result of Defendant's breach of contract;

3. The present value of Plaintiff's past disability benefits is $320,849;

4. Defendant breached the duty of good faith and fair dealing to Plaintiff;

5. Plaintiff is entitled to recover the present value of her future policy benefits as a result of Defendant's breach;

6. The present value of Plaintiff's future disability benefits is $1,200,000;

7. Plaintiff suffered mental and emotional damages as a result of Defendant's unreasonable conduct;

8. The amount of damages that will fairly compensate Plaintiff for her mental and emotional distress is $400,000;

9. Plaintiff is entitled to recover her reasonable attorneys' fees and costs incurred in obtaining the benefits due under her policy;

10. The amount the jury wishes to award in attorneys' fees and costs is $750,000;

11. Defendant acted with oppression, fraud or malice in handling Plaintiff's claim and denying her benefits;

12. The amount the jury wishes to award in punitive damages is $5,000,000.

The Special Verdict was signed by the foreperson and the jury was polled in open court and its members affirmed that their verdict was unanimous.

*JURY INSTRUCTIONS*

The jury received the following instructions prior to their deliberations:

**INDEX OF INSTRUCTIONS**

1. Duties of Jury to Find Facts and Follow Law
2. Instructions to be Considered as a Whole
3. Jury Not to Take Cue from Judge
4. Juror Forbidden to Make Any Independent Investigation
5. Corporations and Partnership—Fair Treatment
6. What Is Evidence
7. What Is Not Evidence
8. Statements of Counsel—Evidence Stricken Out—Insinuations of Questions
9. Direct and Circumstantial Evidence
10. Direct and Circumstantial Evidence—Inferences
11. Weighing Conflicting Testimony
12. Credibility of Witnesses
13. Deposition Testimony
14. Interrogatories
15. Requests for Admissions
16. Charts and Summaries Not Received In Evidence
17. Charts and Summaries In Evidence
18. Stipulated Testimony
19. Discrepancies In Testimony
20. Witness Willfully False
21. Impeachment— Inconsistent Statements or Conduct— Falsus In Uno Falsus In Omnibus
22. Extrajudicial Admissions— Cautionary Instruction
23. Opinion Evidence (Expert Witnesses)
24. Expert Testimony— Qualifications of Expert
25. Weighing Conflicting Expert Testimony
26. Hypothetical Questions
27. Statements Made By Patient To Physician
28. Failure to Deny or Explain Adverse Evidence
29. Burden of Proof and Preponderance of Evidence
30. Contract— A Definition
31. Insurance Policy Defined
32. Insurance—Policy Provisions
33. Insurance—Ambiguity in Policy
34. Plaintiff's Burden to Prove Coverage
35. Breach— Essential Elements
36. Total Disability
37. Transitional Instruction
38. Covenant of Good Faith—Standard
39. Insurance Company's Obligations— Implied Obligation of Good Faith
40. Insurance Company's Obligations
41. Good Faith/Proper Cause
42. Duty to Investigate
43. Ongoing Nature of the Duty of Good Faith and Fair Dealing
44. Good Faith—Equal Consideration
45. **Not Given**
46. Good Faith—Conduct Before Denial
47. Good Faith—Genuine Dispute
48. Good Faith—Policy Coverage
49. Liability of Corporations—Scope of Authority Not In Issue
50. Act of Agent is Act of Principal— Scope of Authority Not In Issue

51. Effect of Instructions As To Damages
52. Damages/Proof
53. Pleadings or Argument—Not Evidence of Damages
54. Damages—Reasonable—Not Speculative
55. Legal Causation
56. Economic and Non-Economic Damages—Defined
57. General Damages/Breach of Contract
58. Damages/Breach of the Covenant of Good Faith and Fair Dealing
59. Emotional Distress
60. Emotional Distress—Defined
61. Susceptibility of Plaintiff
62. Damages Arising in the Future—Discount to Present Cash Value
63. Damages—Attorney's Fees
64. Future Disability Benefits
65. Residual Disability
66. Punitive Damages—Burden of Proof
67. Punitive Damages—Conduct
68. Clear and Convincing Evidence
69. Punitive Damages—Standard
70. Amount of Punitive Damages
71. Punitive Damages—Interest
72. Chance or Quotient Verdict Prohibited
73. Duty to Deliberate
74. Communication with Court
75. Return of Verdict

### PLAINTIFF'S COMPLAINT

Plaintiff's Amended Complaint, filed August 13, 2001, sought the following relief:

[First Cause of Action for violation of Cal.Bus & Prof.Code § 17200, is discussed hereafter].

The Second Cause of Action for Breach of Contract against Paul Revere, Unum-Provident and Doe Defendants. Plaintiff sought damages of $8100 per month in unpaid benefits.

The Third Cause of Action for Breach of the Covenant of Good Faith and Fair Dealing against Paul Revere, UnumProvident and Doe Defendants. Plaintiff sought damages of $8100 per month in unpaid benefits and punitive damages.

The Fourth Cause of Action for Intentional Misrepresentation against Paul Revere, UnumProvident and Doe Defendants. Plaintiff sought damages of $8100 per month in unpaid benefits and punitive damages.

### GENERAL STATEMENT OF THE LAW

■ Judgment as a matter of law is only appropriate when the evidence permits only one reasonable conclusion, contrary to the jury's verdict. *Gilbrook v. City of Westminster,* 177 F.3d 839, 864 (9th Cir.1999), *cert. denied,* 528 U.S. 1061, 120 S.Ct. 614, 145 L.Ed.2d 509. If conflicting inferences may be drawn from the facts, then the case must go to the jury. *Pierce v. Multnomah County, Or.,* 76 F.3d 1032, 1037 (9th Cir.1996). In ruling on a motion for JMOL, the court is not to make credibility determinations or weigh the evidence and should view all inferences in the light most favorable to the non-moving party. *Winarto v. Toshiba America Electronics Components, Inc.,* 274 F.3d 1276, 1283 (9th Cir.2001). As this court said in denying summary judgment in this case, whether an insurer's denial of a claim is unreasonable is a question of fact, unless only one inference may be drawn from the evidence, citing *Carlton v. St. Paul Mercury Ins. Co.,* 30 Cal.App.4th 1450, 1456, 36 Cal.Rptr.2d 229 (1994).

■ A new trial is proper only if the verdict is contrary to the clear weight of

the evidence or is based upon evidence which is false, or to prevent, in the sound discretion of the trial court, a miscarriage of justice. *Silver Sage Partners, Ltd. v. City of Desert Hot Springs,* 251 F.3d 814, 818–819 (9th Cir.2001). A district court may not grant a new trial simply because it would have arrived at a different verdict.

### Defendants' Motion

**Paul Revere claims that the evidence at trial was insufficient to support Plaintiff's claims.**

█ Plaintiff Joan Hangarter is a trim woman in her forties with two children, a boy of nine and a girl of eleven. (Tr. 381:17–20, 24) When she was thirteen she was diagnosed with scoliosis and as an alternative to surgery, her father took her to a chiropractor, who treated her for two years. That experience inspired her to think about becoming a chiropractor herself. (Tr.382:3–11) Plaintiff testified as to the scientific and diagnostic training she received as part of the degree program at Los Angeles College of Chiropractic, where she obtained her Doctor of Chiropractic degree in 1979. She was licensed in California in 1980, after taking national board exams. (Tr. 382:12–383:25) She then opened her practice in Berkeley, Solano Chiropractic. (Tr. 384:3–7) The practice grew rapidly and she loved her patients, many of whom she treated for years, and who in turn brought their children to her for treatment. (Tr. 384:25–385:3)

She testified about the types of adjustments she performed on patients and demonstrated on one of her counsel some typical manipulations of the neck and spine. These manipulations involved her standing over a patient who would be either seated or lying down. To perform the manipulation or adjustment, she would bend over her patient, then pull the patient's arm, neck, spine or rib cage, and perform other maneuvers such as twisting, or pressing, to align the patient's spine. (Tr.386:24–391:17) She described a myofascial release, a procedure to release muscle spasm, which required her to press and pull the contracted muscle and massage it to release the spasm. (Tr. 393:2–22) She also described deep tissue work, a procedure in which she applied pressure with her hands, rubbing deeply, to release painful areas on the spine, (Tr. 393:24–394:10) To obtain the leverage to exert the proper traction, she usually placed her patients on a low table and leaned over them. None of the manipulations were easy to perform. (Tr. 395:1–396:5) On a typical day, prior to her becoming disabled, she would treat between 30 and 50 patients. (396:6–10)

In 1989, after almost ten years in practice and when her daughter was two years old and she was pregnant with her son, Plaintiff purchased an individual disability insurance policy from the Paul Revere Life Insurance Company, a defendant in this case. The purpose of this policy, as the insurance agent explained it to her, was to protect her should she not be able to work as a chiropractor. (Tr. 396:14–400:23, Ex. 1) The agent explained to her that even if she could still do paperwork or other work, if she could not work as a chiropractor, the policy would cover her. (Tr. 406:4–9) The policy also provided that after she had been disabled for 90 days, future premiums would be waived while she remained disabled. After Paul Revere terminated Plaintiff's benefits in this case, the company attached her bank account for the insurance premiums, until the account was drained, at which point the company cancelled her policy. Plaintiff presently has no disability insurance at all. (Tr.417:18–24; 418:1–419:4)

In 1993 Plaintiff began to experience severe recurrent shoulder pain. She sought treatment from a chiropractor in

her office, Dr. England, who adjusted her daily. In 1995 and 1996 she saw an orthopedist, Dr. Isono and sometimes wore a shoulder brace. (Tr. 419:5–25) She did not file any claims for disability coverage and focused on getting better and continuing to work. (Tr. 420:1–9) In 1997 she went to Dr. Linda Berry,[1] a chiropractor, because she was having severe pain in her shoulder, arm and neck. (Tr. 420:15–421:6) She also went for physical therapy. Although she continued this treatment for six to eight weeks, it was not helpful. (Tr. 421:19–424:1) She filed a claim for benefits under her disability insurance policy in May 1997, and started receiving payments. (Tr. 424:230–23) She was in an auto accident in October 1997, which aggravated her pain. (Tr. 237:25–238:8; 424:2–5; 556:12–557:1, 562:15–20, Ex. 3)

Dr. Berry treated Plaintiff from April 1997 to December 4, 2001, and eventually told her that she would probably not ever be able to work again as a chiropractor. (Tr. 563:9–17; 650:5–10) As stated above, Plaintiff had previously been making adjustments on 30–50 patients a day. Each adjustment was physically demanding. Between 1996 and 2000 Plaintiff had 3 Magnetic Resonance Imaging studies ("MRI's") with abnormal findings. The third MRI in May 2000 showed her condition to be growing worse, despite treatment by Dr. Berry and Dr. Isono. Dr. Berry diagnosed her with epicondylitis, cervical intervertebral disk syndrome, and tendinitis. (Tr. 631:22—632:1) Her medical records documented the development of severe pain in her right arm, elbow and neck. Dr. Isono offered only surgery to correct the problem, which Plaintiff rejected based on her past negative experience with post-surgery pain medication. (Tr. 434:1–11, 565:9–21). Plaintiff was also leery of cortisone injections, after experiencing heart palpitations and becoming ill from them. (Tr. 564:20–565:7) Plaintiff stopped seeing Dr. Isono and was treated by Dr. Berry, whose chiropractic manipulations gave her some pain relief and enabled her to get around. (Tr. 584:9–15).

Dr. Berry treated Plaintiff's epicondylitis with what she described as the "RICE formula:" This involved rest, ice, compression and exercise-and-elevation. Plaintiff followed this regimen and obtained temporary relief but no permanent relief. (Tr. 645:1–23) Dr. Berry testified that she treated Plaintiff for her tendinitis as well and that Plaintiff had physical therapy. None of these treatments afforded Plaintiff permanent relief. (Tr. 646:23–648:17) Dr. Berry saw Plaintiff a total of 88 times, most often for no fee, as a professional courtesy. She was paid only for the treatments following Plaintiff's auto accident, but not for the work-related injury. (Tr. 646:6–22; 690:14–18) Dr. Berry, Dr. Katz[2] and the Kaiser and Novato Hospital records all concurred that Plaintiff was severely impaired.

At Plaintiff counsel's request, Dr. Katz reviewed Plaintiff's medical records, including those of Dr. Isono, the reports of

---

1. Dr. Berry testified that she received a B.A. degree from the State University of New York at Binghamton and her Doctor of Chiropractic degree and was licensed to practice in the State of California. At the time of trial she had been practicing for 20 years and had performed approximately 60,000 chiropractic adjustments. (Tr. 625–17–25; 626:17–18; 627:9–10, 19–20) Her practice was located in the same neighborhood as Plaintiff's. (Tr. 420:16–17)

2. Edward Katz, M.D., is an orthopedic surgeon, with experience as a team physician for several high school football teams, in addition to his surgical practice. At the time of trial he was performing approximately ten surgeries each week and seeing about 175 patients. Less than five percent of his patients were seen for medical/legal purposes. He testified for Plaintiff as an expert witness. (Tr. 224:23–226:6)

the MRI scans of the Plaintiff's right shoulder taken in 1997, and of the MRI of her cervical spine taken in 1997, (Ex. 8) the records and deposition of Dr. Linda Berry, the electromyogram ("EMG") studies on March 6th and March 30th, 1998, the report of Dr. Aubrey Swartz, the IME in 1999, the MRI report of May 12th, 2000 (Ex. 19) and the report from Dr. Palatucci retained by the insurance company. (Tr. 227:2–11).

Dr. Katz testified that Plaintiff suffered from lateral epicondylitis, more commonly called tennis elbow, cervical disk disease and rotator cuff tendinitis. (Tr. 227:18–228:17) He examined Plaintiff in July 2001, more than two years after Dr. Swartz saw her in March 1999 (Tr. 263:8–14) and found 75% range of motion in her neck, spasm and tenderness in the right trapezius muscle, and reduced grip strength in her arm. (Tr.230:1–231:21) The grip test result was consistent with her report of pain. (Tr. 231:22–23) He also employed a Spurling test, an objective test for cervical disk disease. This was positive for pain, in the right trapezius and scapular, indicating cervical disk disease at C–5 and C–6. (Tr. 232:7–23, 233:19–22) Dr. Katz also found a depressed biceps reflex on the right side, (Tr.233:1–5), a test which Dr. Swartz did not perform (Tr. 264:15–18), and numbness and tingling of the middle finger of her right hand, when given a pin test, an indicator of nerve root compression affecting the sensory portion of the nerve going down the arm. (Tr. 233:7–18). He did not see any biceps wasting. (Tr. 262:18–20) Dr. Katz attributed the spasm in Plaintiff's right trapezius muscle to spasm from the degenerative disk disease at C–5 and C–6. (Tr. 233:25–234:8). Dr. Berry testified that surgery for her neck would be partic-

ularly dangerous for Plaintiff due to her stenosis (Tr. 642:22–643:14)

Dr. Katz also reviewed the reports of the MRI films of Plaintiff's cervical spine taken May 30th 1997, ordered by Dr. Isono and read by Dr. Cardoza, finding mild to minimal central canal stenosis at 5–6, a narrowing of the spinal canal, which causes some compression on the spinal canal or the nerve roots (Tr. 234:9–23)

The radiologist's finding of "mild" did not mean that Plaintiff's pain would be mild; this varied from patient to patient. (Tr. 234:24–235:6).

When Dr. Katz reviewed the report of the MRI of the same area taken May 12, 2000, (Ex. 19) he found more changes, including a bulging disk at C–5–6, more than in 1997, spurring into the spinal canal, narrowing and mild canal stenosis. He also found right lateral protrusion into an uncinate process [3] at C3–4, spurring and mild right neural foraminal narrowing.[4] At 4–5 he also found a broad-based disk bulge with uncinate spurring at C–6 and a minimal broad-based disk bulge. (Tr. 235:7–236:4). He concluded that Plaintiff's condition was worsening. (Tr. 237:9–11) Her symptoms corresponded to the findings on the MRI. (Tr. 237:14–23) There is surgery for cervical disk disease, but it carries risks, from the anesthesia and other complications. (Tr. 241:6–20) When Dr. Berry reviewed Plaintiff's MRI reports, she too concluded that Plaintiff's condition grew worse between 1997 and 2000. (Tr. 639:5–15)

Dr. Katz reviewed the report of the MRI of Plaintiff's shoulder, taken in 1996, and found evidence of tendinitis [5] or an inflammatory process. This could account

---

**3.** A curved process on bone which can cause spurring which in turn can contact the nerve root and cause pain. (Tr. 237:5–7)

**4.** Narrowing of the canal where the nerve roots are inserted. (Tr. 236:22–24)

**5.** Inflammation of the tendon around a joint.

for the shoulder pain she experienced. (Tr. 238:9–20) He examined her elbow and found good range of motion, no redness or swelling but lateral tenderness. In light of her subjective complaints he concluded she had epicondylitis or tennis elbow. This condition might improve with rest alone, but could require 30 days' immobilization in a cast or sling, physical therapy, the use of ice and heat, steroid injections or anti-inflammatory medications. When all else fails surgery is necessary. Even with surgery, someone like Plaintiff, whose work involved strenuous use of her arms, hands and shoulder, would run the risk of reinjury. (Tr. 239:3–241:5, 275:4–19). He would not recommend that she return to the practice of chiropractics. ( Tr. 276:16–25)

Plaintiff herself described the pain in her elbow as feeling like the muscle was ripping from the bone, and the pain in her shoulder and neck as burning or stabbing. After a day of adjusting patients she would go home in agony. (Tr. 605:25–606:11) Dr. Berry confirmed Plaintiff's description of the pain as burning or stabbing. (Tr. 653:2–6) Dr. Berry also confirmed an objective basis for Plaintiff's pain when she examined Plaintiff and obtained a flinch response (Tr. 653:7–14)

In October 1997, Paul Revere approved her claim for total disability benefits; thereafter her condition did not improve. While she was receiving benefits from her policy, Plaintiff attempted to continue adjusting patients, but was forced to hire Dr. Parissa Peymani to adjust patients while she ran the rest of the practice. (Tr. 440:23–442:1) Dr. Peymani testified that after she started working, Plaintiff stopped seeing all but five to seven of her patients. Peymani testified that during the year-and-a-half she worked for her, Plaintiff performed adjustments for only 5 out of over 9,000 patient visits. Plaintiff had to terminate Dr. Peymani in May 1999, because she could no longer afford to pay

her. (Tr. 1087:9–13, 19–22;1088:17–21;1090:3–8; 1105:17–18; 1114:22–1115:23) Finally she decided to sell her practice to Dr. Sugarman, another chiropractor whom she had brought in to replace Dr. Peymani. (Tr. 447:7–23)

The practice had not been profitable with Dr. Peymani, and it remained unprofitable when Plaintiff was paying Dr. Sugarman, because the patient volume had dropped since she had stopped treating patients herself. (Tr. 447:24–448:5) Some patients were so loyal to her that she had to gradually "wean" them by continuing to treat them with certain procedures until the patients were comfortable with another doctor or left the practice. (Tr. 511:1–18, 512:8–25) When she sold the practice she did so without obtaining any legal advice and now believes she did "a stupid thing."

On cross-examination, Defendants asked Plaintiff about her deposition in this case, in which she had testified that her practice had not been doing as well in the years before she became disabled, due to managed care. She responded that after her deposition she reviewed her financial records and discovered that in fact the practice had continued to do well, despite the increased paperwork. (Tr. 600:11–25, 601:16–602:13)

At the time Plaintiff sold her practice she believed she would still be receiving her disability benefits. In fact, they were terminated the day after she signed the contract with Dr. Sugarman. (Tr. 449:4–25) Before she became disabled she had been earning a net income from her practice of almost $100,000 per year. (Tr. 488: 20–23, 532:17–19, Ex. C, 533:15–19, 536:14–16) After she became disabled, most of her draw from the business came from the business overhead insurance policy benefits paid by Defendants. For the entire time she was receiving benefits, she was unable to perform chiropractic adjustments on patients, by far the most impor-

tant duty of her occupation. None of her attempts to start another business produced a profit.

Defendants' contention that Plaintiff merely wanted to change careers was rebutted by Plaintiff's own testimony that she loved her patients, it was very hard for her to give up being a chiropractor, that she would return to working as a chiropractor today if she could, that she had repeatedly tried to continue treating patients even after she became disabled, and that it was always her intention to return to work. (Tr. 440:7–9; 446:1–21, 561:4, 603:10–604:19)

Dr. Berry also testified that Plaintiff loved being a chiropractor and that Dr. Berry had encouraged her to continue to try to adjust patients, even while she was being treated herself. However, the pain, especially in her elbow and arm, was too much, and they concluded that Plaintiff could not return to work adjusting patients. (Tr. 651:22–652:10)

*Conclusion regarding sufficiency of the evidence*— The jury heard more than enough evidence to conclude that Plaintiff was totally disabled and that Defendants in bad faith terminated her benefits and caused her damages.

**1) Defendant contends that Paul Revere did not breach its contract with Plaintiff.**

██ Plaintiff bought a policy in which Defendants promised to pay her benefits if she became totally disabled from working at her own occupation or gainfully employed at another occupation. Despite conclusive evidence that Plaintiff was unable to work as a chiropractor and that her other attempts to work had failed, after one and one-half years of paying benefits, Defendants subjected her to a biased med-

ical examination, then re-characterized her occupation as a business owner, rather than a chiropractor, and claimed she was not totally disabled because she could perform bookkeeping or teach a class or see two patients per hour. (Tr. 403:10–23, 404:1–23; 405:11–19; Ex. 20) Defendants breached their contract with Plaintiff to provide an objective evaluation of her ability to perform her own occupation and to pay her benefits if she were to become totally disabled from her own occupation. Although Dr. Isono found plaintiff had no objective signs of impairment, this was contradicted by Dr. Katz, Dr. Berry, the Kaiser records and the Novato Hospital records.[6]

Dr. Katz, the orthopedic surgeon who examined Plaintiff at counsel's request, testified that she had lateral epicondylitis, cervical disk disease, rotator cuff tendinitis and mild central canal stenosis. He also testified that a mild stenosis did not mean that she would only experience mild pain from it. He also testified that her pain from the other conditions was at a level of 8.5 on a scale of 10 and that she was also depressed as a result of the chronic pain. (Tr. 245:2–246:2) He agreed with Dr. Berry that Plaintiff would no longer be able to practice chiropractics even with surgery to her neck and elbow. (Tr. 246:12–247:4, 271:20–25) He reversed the Independent Medical Examiner ("IME") reports of Dr. Swartz (Ex. 17) and concluded that all the objective findings were abnormal. He disagreed with Dr. Swartz's conclusion that Plaintiff would be able to see two chiropractic patients per hour. (Tr. 241:24–244:22, Ex. 20) Plaintiff would have been eligible for benefits even with no objective findings if her pain rendered her totally disabled or eligible for residual benefits. (Tr. 767:1–768:2)

**6.** This was the Emergency Room visit where her arm hurt so much she thought she had broken it.

*Conclusion re breach of contract*— Defendants breached their contract with Plaintiff to continue to pay her benefits as long as she remained disabled from working at her own occupation.

**2) Defendant contends that Plaintiff failed to present sufficient evidence that Paul Revere denied her claim in bad faith.**

■ Frank Caliri, Plaintiff's expert, testified that Paul Revere had a time line for terminating claims and that by the end of 18 months of benefits, a targeted claim would be due for termination (Tr. 287:11–289:11). The kinds of resolutions on the claims time line included: "return to work, pay enclosed, denial, termination, rescission, settlement, litigation, ongoing claim approval or other referrals." Five out of eight specific goals were negative for claimants. (Tr. 289:16–290:2)

The jury heard testimony that Defendants' claims handling personnel evaluated Plaintiff with the intent to deny her claim, that they deliberately employed a biased examiner in Dr. Swartz, and that they terminated her benefits despite the fact that she was totally disabled from performing her own occupation, her attempts to make a living by other means had failed, and she was entitled to benefits under the terms of her policy. (Tr. 213:12–214:19)

*Conclusion re bad faith*— The jury heard ample evidence from multiple sources that Defendants set out to target claims such as Plaintiff's with termination the goal, and that Defendants evaluated her claim with the purpose of terminating her benefits.

**3) Defendant contends that There was a genuine dispute as to Paul Revere's liability for coverage.**

■ If an insurer's investigation of a claim was biased, it bars a finding that the insurer was engaged in a genuine dispute. *Chateau Chamberay Homeowners Ass'n v. Associated Intern. Ins. Co.*, 90 Cal.App.4th 335, 348 fn. 7, 350, 108 Cal.Rptr.2d 776 (2001). (When an insurer's investigation or reliance on experts does not reflect a genuine dispute, the bad faith claim should go to the jury.) The following factors may indicate an insurer's bias:

1. The insurer may have misrepresented the nature of the investigatory proceedings;

2. The insurer's employees lied in depositions or to the insured;

3. The insurer dishonestly selected its experts;

4. The insurer's experts were unreasonable; or

5. The insurer failed to conduct a thorough investigation; *Id.*

■ Plaintiff's expert, Frank Caliri, testified that Defendants did all of the above, as follows:

1. Paul Revere misrepresented the benefits available to Plaintiff, by not informing her about recovery benefits,[7] residual benefits [8] or rehabilitation benefits [9]

7. A recovery benefit is provided in the policy if, prior to age 65, an insured is engaged in any occupation immediately after a period of disability for which benefits were paid and incurs a loss of earnings equal to at least 20% of prior earnings. This does not require disability or being under the care of a physician (Tr. 33:4–13) (Plaintiff Ex. 1).

8. Residual disability benefits are provided in the policy if the insured is unable to perform one or more of the important duties of her occupation; is unable to perform the important duties of her occupation for more than 80% of the time normally required to perform them; or her loss of earnings is equal to at least 20% of her former earnings while engaged in her occupation or another occupation; and she is under the regular and personal care of a physician. (Tr. 32:3–13);(Plaintiff Ex. 1). Mr. Caliri testified that Defendants' termination letter to Plaintiff

and telling her in their denial letter that her policy was subject to ERISA, when it wasn't. (Tr. 82:23–83:6, 84:25–85:1, 138:3–140:9, 140:21–141:19, 194:3–196:9, 198:7–199:22, *see* Order Denying Partial Summary Judgment, issued January 3, 2001)

2. Paul Revere exhibited bias against Plaintiff in its selection of an IME doctor with the purpose of challenging the claimant's disability and in not providing Plaintiff's in job description in the IME letter.[10] The examiner made his evaluation without having the claimant's description of her work. (Tr. 85:8–89:1, 128:2–132:17, 133:12–22)

3. Paul Revere compelled the insured to litigate to obtain continued benefits.

4. Paul Revere did not settle in good faith when its liability was clear.

5. Paul Revere failed to pay as it was obligated to under the policy. (Tr. 74:2–75:17, 79:14–80:11)

Defendants had a bias against claims like Dr. Hangarter's. They planned to save money by terminating claims like hers. They sent her to be examined by Dr. Swartz, who was biased—— 13 of 13 claimants whose records Plaintiff obtained were found by Dr. Swartz not to be totally disabled. (Tr. 135:12–16;136:8–24) Dr. Swartz himself was further influenced by

Defendants' employee Dr. Bianchi, who in the referral letter expressed to Dr. Swartz his opinion regarding the results of the medical diagnostic tests and advised him that Plaintiff would probably improve with conservative treatment. (Tr.90:15–91:18, 294:12–295:13, Ex. 28). Dr. Bianchi had never met Plaintiff at the time he expressed this opinion. (Tr. 474:4–12)

Defendants rely on the *Phelps* case to bolster their claim that there was a genuine dispute over coverage. However, *Phelps* involved no company-wide scheme to terminate expensive disability claims to increase profits. *Phelps* also did not involve a challenge to the IME doctor or to the accuracy and reliability of the IME. In fact, the insurer in *Phelps* relied on three separate IME's before terminating benefits. *Phelps v. Provident Life & Acc. Ins. Co.*, 60 F.Supp.2d 1014, 1021–22 (C.D.Cal. 1999).

In addition, Defendants in the case at bar developed, with the expertise of Ralph Mohney,[11] a comprehensive system for targeting and terminating expensive claims like Plaintiff's. She was a professional in California with an "own-occupation" policy. Under Defendants' risk analysis her claim fit the profile as one with a potentially adverse financial impact on Defendants. (Tr. 98:4–16). This targeting scheme was

---

9. While an insured is receiving total disability benefits, she may choose to join a vocational rehabilitation program, during which she may receive benefits for 36 months without being under the care of a physician, in order to be retrained in another occupation. (Tr. 34:18–34:7) There was nothing in the claim file to indicate that Plaintiff was offered this covered benefit. Mr. Caliri testified that failing to inform an insured of a covered benefit fell below industry standards. (Tr. 80:20–81:17)

wrongly advised her that she was not eligible for this benefit. (Tr. 82:2–22) Plaintiff also testified that Defendants' representative Mr. Seaman told her she was not eligible for residual benefits. (Tr. 550:17–22)

10. Plaintiff had given Defendants an Occupational Description Form describing her work at the time she filed her claim for benefits. (Tr. 501:21–502:14, Ex. 63)

11. Former Vice President of Claims for Provident starting in 1994, assuming responsibility for group disability claims with the acquisition of Paul Revere in 1997, then with the merger with Unum in 1999. Mr. Mohney was Senior Vice President, Customer Care, for UnumProvident (the combined companies) at the time of Plaintiff's claim. (Tr. 118:6–22, 764:18, 768:22–769:1, 771:3–24)

described by Dr. Feist,[12] who testified about the changes Ralph Mohney introduced at Provident and brought with him to Paul Revere, such as round table claims reviews and the goal of achieving a "net termination ratio" (the ratio of the value of terminated claims compared with new claims).[13]

Mohney's goal was to increase this ratio to 84% (Ex. 35). By 1996 Provident increased the net termination ratio goal to 90% (Ex. 37). By 1997, the ratio was increased to 104% (Ex. 38). These goals provided an incentive for Provident to terminate claims with high reserves, such as Plaintiff's. (Ex. 23, 34, 36, 41, 47, 116(A))

One of the claims handling processes introduced by Ralph Mohney when he came to Paul Revere from Provident was the round table. The round tables were meetings of Paul Revere personnel, at which each adjustor brought one or more of a "Top Ten List" of claims to be targeted for intensive efforts to achieve "successful resolution." (Ex. 47, 48) The round tables were usually held after hours, (Tr. 809:18–21) and the discussion would begin with the dollar amount of the claim (Tr. 829:24).

Frank Caliri testified that the round table process fell below insurance industry standards for several reasons: the purpose was to target claims in order to meet net termination ratio targets, and the proceedings were not documented in the claims files. (Tr. 60:18–61:2) Plaintiff's notice of claim was July 8, 1997; Paul Revere received the claim form on August 12, 1997; and her case was taken to a round table on September 9, 1997. The round tables focused on claims with a high reserve—— one to two million dollars, where the insured was a disabled professional who had been receiving benefits for months or years. (Tr. 829:16–24; Ex. 48). Plaintiff fit this profile.

Dr. Feist also testified that Ralph Mohney told him that company policy was that after his taking over the claims area, doctors were no longer permitted to express their opinions regarding disability in the claims file and that such decisions were reserved for the claims handling personnel only. (Tr. 822:1–13; 824:2–6). This changed the prior procedure which had been that doctors determined whether claimants were disabled. (Tr.822:17–19). Preventing doctors such as Dr. Feist from expressing an opinion of disability in the claims file left more latitude for claims personnel to make their own decisions. (Tr. 831:15–19; 833:20–24).

Dr. Feist described other new tactics as well, such as the following:

(1) searching for the "right physician to do the IME because we want to get the answer we want; we don't want to get the answer that's detrimental to our cause;"

(2) questioning financial qualifications for the initial policy;

(3) questioning the attending physician's integrity; [14]

---

**12.** William Feist, M.D., was formerly a Vice-President and Medical Director of Provident Life & Accident Insurance Co., from 1982 to 1996 and is currently Medical Director of another insurance company and a board certified specialist in Insurance Medicine. Excerpts from his deposition testimony taken August 23, 2001 in Birmingham, Alabama, in the case of *United Policy Holders, et al. v Provident Life & Accident Ins. Co.*, were admitted in evidence in this case. (Tr. 59:19–21, 62:25–63:1, 111:5–12, 111:22–112:6, 801:20–835:14).

**13.** Defendants conceded at trial that Unum-Provident benefitted financially from the acquisition of Paul Revere Life Insurance Co. and that the increase in income in 1999 was primarily due to "the acquisition of Paul Revere and improved results in the company's *individual disability income* line of business." (Tr. 121:3–16) (Emphasis added).

**14.** Defendants' counsel at trial repeatedly addressed and referred to Plaintiff's treating chiropractor as "Linda Berry" or "Ms. Berry," rather than "Dr. Berry." (Tr. 250:1–2, 557:5,

(4) using surveillance inappropriately, and

(5) accusing the insured of fraud. (Tr. 824:25–825:3; 827:17–24.)

Dr. Feist concluded that the goal of the round table discussions to terminate claims was unethical. (Tr. 820:14–20).

The practice of conducting round table meetings was adopted by Paul Revere from Provident after its acquisition by the parent company. (Ex. 46, 5). This is documented in the 1996 "Provident/Paul Revere Transition Plan."

*Conclusion regarding existence of a genuine dispute*— The evidence is overwhelming that Paul Revere intended to terminate claims such as Plaintiff's, that her claim had been taken to a round table on more than one occasion, and that the purpose of the round table reviews was to find a way to terminate benefits. (Tr. 65:14–67:10, 94:21–24, 807:13–18; 810:2)

**4) Defendant contends that Paul Revere conducted a thorough and unbiased investigation of Plaintiff's claim.**

■ The court has already analyzed how the Defendants did not have a genuine dispute over their duty to provide benefits to Plaintiff, but instead deliberately set out to terminate her claim. In addition, Defendants' employees testified repeatedly that they neither knew nor used the California definition of total disability. They attempted to apply an artificial standard to avoid the requirements of California law in their efforts to find plaintiff not disabled. They chose an examiner, Dr. Swartz, with a record of finding claimants not disabled and instructed him through Dr. Bianchi in how he should find that Plaintiff's condition with conservative treatment would improve over time.

*Conclusion re Paul Revere's thorough and unbiased investigation*— Most of the company's efforts on Plaintiff's claim were directed toward the goal of terminating her benefits.

(See also No. 3 above.)

**5) Defendant contends that the Jury should not have awarded punitive damages.**

■ To award punitive damages, the jury had to find clear and convincing evidence that Defendants acted with malice, oppression or fraud. A defendant may only succeed in a claim that an award of punitive damages violates its due process rights if it can show it had no notice that what it was doing was wrong. A conscious disregard of the rights of insureds to know about company policies which would potentially affect a decision whether to purchase a policy creates a presumption that the insurer knew that its policies were deceptive. *Notrica v. State Compensation Ins. Fund* 70 Cal.App.4th 911, 949, 83 Cal. Rptr.2d 89 (1999) (Where senior management personnel knew that company policy would lead to increased premiums for insureds, conscious disregard of rights of policyholders was fair notice that company's conduct could subject it to punitive damages.)

■ In the case at bar, Defendants should have been on notice that targeting certain categories of claims, using biased examiners, ignoring the California definition of total disability, misinforming or failing to inform insureds regarding all of their potential benefits, and other practices which fell below industry standards could put them at risk for punitive damages.[15]

---

559:12, 20, 25, 562:25, 592:1) Counsel referred to Defendants' witness, Chiropractor Parissa Peymani as "Dr. Peymani." (Tr. 1097:3–4)

**15.** Plaintiff testified that, once her total disability benefits were terminated, no one from Paul Revere informed her about any other benefits. (Tr. 410:8–412:9; 414:20–419:4).

The jury was properly instructed on the elements of malice, oppression and fraud and the distinctive burden of proof imposed upon Plaintiff as follows:

"Clear and convincing" evidence means evidence of such convincing force that it demonstrates, in contrast to the opposing evidence, a high probability that the facts of which it is proof are true. (Jury Instruction Number 68)

■ In evaluating the reasonableness of an award of punitive damages, the entire record must be viewed in the light most favorable to the judgment, and reversal is appropriate only when "the award as a matter of law appears excessive, or where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice." *Neal v. Farmers Ins. Exchange, supra*, 21 Cal.3d at p. 928, 148 Cal.Rptr. 389, 582 P.2d 980 (1978) (internal quotation marks omitted.) If the conduct upon which the award is premised was fraud perpetrated by an insurer upon an insured, such conduct clearly supports an award of punitive damages. (*Pistorius v. Prudential Insurance Co., supra*, 123 Cal.App.3d 541, 556, 176 Cal.Rptr. 660 (1981)) *Cited in Notrica v. State Compensation Ins. Fund* 70 Cal. App.4th 911, 951, 83 Cal.Rptr.2d 89 (1999).

With respect to requirement of a finding of malice, oppression or fraud, it is not necessary that the compensatory damages be based on a finding of fraud, only that the plaintiff meets the evidentiary burden to prove bad faith:

[Defendant's] error is in urging that the "fraud" within Civil Code section 3294 be conjoint with a finding of compensatory damages based upon a legal theory of fraud. That position is incorrect. All that is required is that the fraud must equate to the conduct which gives rise to liability—in this case bad ·faith.

*Pistorius v. Prudential Insurance Co.* (1981) 123 Cal.App.3d 541, 555–556, 176 Cal.Rptr. 660, cited in *Notrica.*

■ Due process prohibits only a "grossly excessive" award, leaving to the states "considerable flexibility to find" whether "the damages awarded [were] reasonably necessary to vindicate the State's legitimate interest in punishment and deterrence." *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). No "simple mathematical formula" shows what is grossly excessive because a "particularly egregious act" will support a higher award for punitive damages. *Id.* At 582.

*Conclusion re jury award of punitive damages*— The jury heard ample evidence regarding Defendants' conduct, constituting the type of malice, oppression or fraud sufficient to justify punitive damages: the round tables, the use of a biased medical examiner, failing to advise plaintiff of benefits to which she was entitled, and then terminating her benefits when she remained totally disabled. In the case at bar, the jury found sufficient egregious acts by Defendants to justify its award of punitive damages.

**6) Defendant contends that the Jury should not have awarded future benefits.**

■ In a motion in limine in this case, Defendants attempted to exclude evidence of Plaintiff's eligibility for future benefits. This court denied the motion. Defendants argue again that plaintiff may not recover future disability benefits if the insurance policy provides for periodic payments and conditions payment of benefits upon continuing proof of disability. They cite the decision in *Erreca* to support their contention that an insurer's refusal to pay future benefits according to a policy does not entitle the insured to treat the entire contract as repudiated and ask for future

disability payments on a theory of anticipatory repudiation. *Erreca v. Western States Life Ins. Co.*, 19 Cal.2d 388, 121 P.2d 689 (1942).

However, Defendants erroneously applied the holding in *Erreca* to the case at bar. In *Erreca,* the court held that the insured had no cause of action for benefits which had not accrued. The court found that the disability benefits stopped accruing when the insured refused to submit to a physical exam as required by the insurer's policy. However, the benefits continued to accrue for the insured up until the time he refused to submit to an exam as required by the policy, even though the insurer had stopped making payments. In contrast, in the case at bar, Defendants cannot contend that Plaintiff did not comply with the requirements of the policy. A court applying the holding in *Erreca* to this case would find that the Plaintiff's benefits have accrued and therefore any claim for future benefits is valid, the opposite of Defendants' position.

Defendants concede that the California Court of Appeal for the Third District has construed the court's decision in the *Egan* case to allow for an award of future benefits following a finding of bad faith. *See Pistorius v. Prudential Ins. Co. of Am.,* 123 Cal.App.3d 541, 551, 176 Cal.Rptr. 660 (1981), *citing Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979). However, they believe that the California court erred and rely on the decision in *U.S. v. Ramos,* 39 F.3d 219, 222 (9th Cir.1994) ("since we are convinced the Arizona Supreme Court would interpret [Ariz.Rev.Stat. § 13–3883(B) ] differently than the [Arizona Court of Appeals], we reach our conclusion as to the subsection's meaning despite the interpretation given it by the [Arizona Court of Appeals]"). 123 Cal.App.3d at 551, 176 Cal.Rptr. 660. This court sees no reason to look to a federal court's interpre-

tation of Arizona law in order to decide the proper damages for a tortious breach of contract in California, when there is good California law available.

In the case at bar the court gave the following instruction to the jury on damages for bad faith:

### DAMAGES/BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

If you find that the defendant breached its duty of good faith and fair dealing, then you may award plaintiff an amount that will compensate her for all damages legally caused by that breach, including:

1. *An amount of future contract benefits that you reasonably conclude after examination of the policy and other evidence that plaintiff would receive had the contract been honored by the insured;*

2. An amount that will compensate for plaintiff's emotional distress and injury;

3. An amount that will compensate for plaintiff's economical losses, including loss of the value of time, interest expense, attorneys' fees and any other losses you determine she sustained as a result of the breach of covenant of good faith and fair dealing.

(Emphasis added). (Jury Instruction Number 58)

This court finds that the jury was properly instructed and that future benefits are an appropriate form of damages for an insurance company's breach of the covenant of good faith and fair dealing.

*Conclusion on future benefits:* What other courts have held and what this court holds here, is that if Plaintiff has at all times complied with the terms of the policy and Defendants in bad faith breached their

obligation under those terms, then Plaintiff is entitled to all benefits which have accrued, including future benefits. Why should Dr. Hangarter have to submit to future physical examinations to prove her continued disability when the jury has already found that the insurance company cannot be trusted to deal fairly with her? It would be illogical for the court to find as a matter of law that a prevailing plaintiff in a bad faith case should have to continue to submit to the same treatment in order to receive the future benefits of a contract where she has complied with its terms and the insurance company has not.

## DEFENDANTS ALLEGE COURT MADE EVIDENTIARY ERRORS

**7) Defendants assert that the court should not have admitted the testimony of Frank Caliri, that he lacked qualifications to testify about insurance industry claims adjustment standards, that he testified to factual matters which should have been left to jury, legal matters which should have been left to court, and that his testimony was unreliable.**

█ The court decided this issue for the first time before trial in a motion in limine and again in a detailed ruling during trial:

> The Ninth Circuit has held that an expert's testimony and qualifications need not be evaluated according to *Daubert* if the expert is both qualified and testifying based on his own experience. *Thomas v. Newton Intern. Enterprises,* 42 F.3d 1266 (9th Cir.1994) (longshore worker with 29 years experience in numerous job categories and for different stevedoring companies qualified to testify as expert on working conditions of experienced longshore personnel) *Id.* at 1269–1270. *Daubert* only applies to an expert testifying based on hard science

and specifically on the application to the evidence of a particular methodology. Other courts have held specifically that an insurance expert's testimony and qualifications are not subject to the requirements of *Daubert.* *U.S. Fidelity & Guar. Co. v. Sulco, Inc.,* 171 F.R.D. 305 (D.Kan., 1997). *Id.* at 308 (citations omitted)

█ Furthermore, an expert in insurance bad faith may reasonably rely on the application of statutes in determining the reasonableness of a company's actions. *Kraeger v. Nationwide Mut. Ins. Company,* 1997 WL 109582 (E.D.Pa.1997). It would be reasonable for experts in bad faith insurance practices to look to the relevant statutory and regulatory requirements in examining the reasonableness of an insurer's actions. *Id.* at *2.

The California Supreme Court has allowed expert testimony on "the conduct and motives of an insurance company in denying coverage":

> We can conceive of many ways in which a lay jury, in assessing the conduct and motives of an insurance company in denying coverage under its policy, could benefit from the opinion of one who by profession and experience, was peculiarly equipped to evaluate such matters in the context of similar disputes.

*Neal v. Farmers Ins. Exch.,* 21 Cal.3d 910, 924, 148 Cal.Rptr. 389, 582 P.2d 980 (1978)

Mr. Caliri has twenty-five years' experience working for insurance companies and as an independent consultant. His experience includes marketing insurance products, evaluating them, evaluating insurance claims and assisting insureds in dealing with insurance companies to obtain payment of their claims. (Tr. 3:13–19, 6:2–17, 13:1–6). He worked for both Unum and Provident as a representative at the time many of the own-occupation disability policies like Plaintiff's were sold (Tr. 5:14–19,

10:5–14). He became familiar with the important features of the insurance contracts (Tr. 5:20–25). He has received training from the insurance companies and has educated himself on how insurance companies in general, and the Defendants in this case in particular, operate. (Tr. 13:15–15:15, 16:18–17:20).

He is qualified as an expert on the basis of his experience in dealing with insurers and insureds. In arriving at his opinion whether Defendants' handling of Plaintiff's claim comported with the standards in the insurance industry, he relied on his education, his experience and his understanding of the requirements of state law, specifically Unfair Settlement Claims Practice § 2695.[16] In his opinion, the standards of the industry impose an obligation on insurance companies such as Defendants to be fair, objective and thorough in their evaluation and analysis of a claim; not to put their financial interests above those of their insureds, not to search for ways to deny a claim, not to misrepresent provisions of the insurance policy including coverage benefits, not to pay less on a policy than the insured is rightfully owed, and not to compel insureds to sue in order to receive benefits. He testified as well that it is standard in the industry that written records of the claim process be kept in the claim file. (Tr. 26:16–19, 26:19–20, 26:23–25, 27:1–10, 27:11–16, 27:17–23, 27:24–28:13).

He testified that it was improper to set a goal to terminate a certain percentage of claims. (Tr. 50:1–13) He testified to his interpretation of internal Provident documents which in his opinion set goals for terminating whole blocks of claims without reference to the merits of individual claims for benefits, for example, a directive that each adjuster will maintain a list of ten claimants "where intensive effort will lead to successful resolution of the claim. As one drops off another name will be added." (The "Top Ten Lists") He referred to testimony by Ralph Mohney and Sandra Fryc[17] that "resolution" meant "termination." In his opinion this practice fell below industry standards because it violated the principle of looking at each policy claim objectively, fairly and on a case-by-case basis. (Tr. 55:8–56:1).

*Conclusion re Frank Caliri:* This court found him qualified by training and experience to testify as an expert on insurance industry practices and standards and whether Defendants' policies and practices complied with those standards, but not to render an opinion on the ultimate issues in the case (Tr. 25:2–7, 40:2–8, 40:20–41:4, 41:18–22, 42:3–43:1, 43:22–44:11, 49:3–9, 102:9–16). This court finds that he was qualified, and that his testimony fell well

---

**16.** Title 10 California Code of Regulations Sections 2695.1–2695.17 are regulations concerning, as their heading states, "Fair Claims Settlement Practices Regulations." These regulations interpret Insurance Code section 790.03, subdivision (h), which prohibits unfair claims settlement practices by those conducting the "business of insurance" (id., § 790.03). *Cates Construction, Inc. v. Talbot Partners,* 21 Cal.4th 28, 62, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999). Review Granted and Opinion Superseded by *Cates Const., Inc. v. Talbot Partners,* 941 P.2d 56, 66 Cal.Rptr.2d 423 (1997) (NO. S061215), Reversed in Part by *Cates Construction, Inc. v. Talbot Partners,* 21 Cal.4th 28, 86 Cal.Rptr.2d 855, 980 P.2d 407 (1999).

**17.** Sandra Fryc at time of trial was employed by UnumProvident as Litigation Manager. She handles disability claims for all types of impairments throughout the United States. She was currently responsible for 100–125 claims in litigation. She began working for Paul Revere in 1987. She was promoted to Claims Manager in 1992, handling at first the Mid–Atlantic states, supervising five claims representatives and four or five field representatives, until 1996 when she was made a director overseeing California and Hawaii. (Tr. 930–932).

within the parameters of his expertise without impinging on the province of either the court or the jury.

**8) Defendant contends that the court should not have admitted the deposition testimony of Dr. Feist. He was improperly permitted to testify as an expert. His deposition was inadmissible hearsay. It was more prejudicial than probative and should have been excluded under FRE 403.**

This was also dealt with in a motion in limine in which the Defendants objected that the witness was not genuinely unavailable as required by FRCP Rule 32(a)(3), that they had no opportunity to cross-examine pursuant to 804(b)(1), that Dr. Feist had never worked for Paul Revere itself and that he left Provident prior to the merger of Paul Revere and the Provident Companies. Defendants also objected to Dr. Feist's testimony as prejudicial to Defendants.

Fed.R.Evid. 804(b)(1) permits introduction of former testimony which was given under oath and subject to cross-examination by the party against whom the testimony is offered:

"Former testimony ... in a deposition [where] the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed.R.Evid. 804(b)(1).

The court denied Defendants' motion to exclude Dr. Feist's deposition from evidence at trial. The court held that his deposition in the case of *United Policyholders, et al., v. Provident Life and Accident Insurance Co., UnumProvident Corp., and Bay Brook Medical Group* (Alameda County Super. Ct. No. 815688–2) was relevant to the case at bar. Dr. Feist had participated as Medical Director of Provident in roundtables where termination of own-occupation policies was dis-

cussed. He testified at his deposition about Defendant's business practices which resulted in the termination of claims which were targeted as Plaintiff's was.

The *United Policyholders* case was also a suit for wrongful termination of disability benefits for an own-occupation policy. (Tr. 110) Dr. Feist lives in Alabama, outside the court's subpoena power under FRCP Rule 45, and was thus unavailable pursuant to Rule 32(a)(3). The court also held that the Defendants in the case at bar have had an opportunity to cross examine him with similar motive. (FRE 804(b)(1)) Defendants' counsel was notified that Dr. Feist's deposition was being taken in the *United Policyholders'* case, the witness was on the witness list in this case (Tr. 116:1–5), and counsel's partner, representing Provident Life & Accident Insurance Co. and UnumProvident, participated energetically in the deposition, objecting to virtually every one of Plaintiff's questions. (Tr. 110:9–24) In fact, UnumProvident was a co-defendant in the *United Policyholders* case, just as it is in this case, and therefore the same defendant was represented at the deposition in the *United Policyholders* case. (Tr. 741:1–21, 742:14–743:25).

The court had previously ordered that deposition testimony from other cases could not be introduced at trial. The court distinguished Dr. Feist's deposition from the depositions excluded by its prior ruling. The other depositions were offered with respect to the final determination of whether or not the individual was disabled and whether benefits would be continued. Dr. Feist's testimony, by contrast, deals with claims handling procedures which a jury could reasonably infer were carried over from Provident to Paul Revere as a subsidiary of UnumProvident after Unum and Provident combined under the name of UnumProvident. (Tr. 745:2–17). *See Murray v. Toyota Motor Distributors,*

*Inc.*, 664 F.2d 1377, 1379–1380 (9th Cir. 1982) (deposition testimony of unavailable former employee of affiliated company admissible against affiliate with similar motive where both controlled by same parent company).

*Conclusion regarding deposition of Dr. Feist:* This deposition was subject to the hearsay exception since the witness was unavailable and had been subject to cross-examination by the Defendants' counsel in another action. He was not offered as an expert so much as a percipient witness to Defendants' claims handling practices. Defendants had notice that Dr. Feist was a potential witness. His name was on Plaintiff's amended witness list filed with this court on September 6, 2001 (Decl. of Alice Wolfson in Support of Motion to Amend at Ex. 2) The court finds once again that the admission of Dr. Feist's deposition was proper. He was unavailable, he was offered as a percipient witness and he was examined by counsel for co-defendant UnumProvident with the same motive as in this case.

**9) Defendants contend that the court erred in admitting the documents produced by Provident in another lawsuit.**

■■■ In its December 13, 2001 Pre–Trial Order, the court ruled: "With regard to Plaintiff's Exhibit Nos. 115–155, the so-called 'Provident Documents,' Defendants' motion to exclude these documents from evidence is granted, without prejudice. If, in the course of trial, a nexus is established

between these documents and Plaintiff's claim, the court will re-consider the issue."

At trial, Defendants admitted that the documents were business records of Provident. (Tr. 48:8–12). Many of the documents were read to the jury by Ralph Mohney. (Tr. 837–863). The documents confirmed that Provident claims handling practices were adopted by Paul Revere.[18] Exhibit 153, 155—"Bring Wooster (Paul Revere) reporting into conformance with Chattanooga (Provident) standards."[19] (Ex. 81—Provident to Paul Revere Transition Plan). Frank Caliri also testified that he read depositions of Provident employees which led him to conclude that employees of Provident and Paul Revere together worked out the transition of Provident claims handling practices to Paul Revere. (Tr. 51:16–52:2, 145:1–152:2, 152:14–154:3) The plan was to take an aggressive approach to claims handling, and using round tables, independent medical examiners, and surveillance to achieve the desired net termination ratios.[20] (Tr. 52:18–23)

This court reviewed the documents and the deposition of Mr. Parks, the Provident employee who authenticated the documents. The court observed that the documents were created before Plaintiff filed her claim for benefits but after she bought her policy from Defendants. At that time Paul Revere had not yet been acquired by Provident. (Tr. 528:7–11) The court at

---

**18.** Provident Life & Accident Insurance Company merged with Unum Insurance Company in 1999 to form UnumProvident. Paul Revere is a wholly owned subsidiary of UnumProvident. (Tr. 118:24–119:10, 122:24–123:6) Employees who handled Plaintiff's claim at Paul Revere were paid by UnumProvident (Tr. 120:1–3)

**19.** Paul Revere's headquarters is in Wooster, Massachusetts, Provident's in Chattanooga, Tennessee.

**20.** The net termination ratio was the proportion of terminated claims to new claims. For example, Frank Caliri testified based on Provident documents that in 1996 the goal was to terminate ninety dollars in existing claims for disability coverage for every hundred dollars of new claims, a net termination ratio of 90 percent. (Tr. 53:4–12) By the second quarter of 1997 the ratio had been raised to 124 percent, to terminate 124 dollars in existing claims for every 100 dollars in new claims. (Tr. 282:17–23).

trial listed a number of ways in which the documents could be authenticated:

1) They were admitted by Judge Conti in a similar case, *Schneider v. Provident Life & Accident Ins. Co.* (C–97–4646 SC, N.D.Cal.); (Tr. 748:15–16, 19–21, 750:4–11,22–751:21).

2) They were produced by defense counsel for companies which ultimately became UnumProvident; (Tr. 750:25–751:3)

3) Frank Caliri was familiar with the documents and could attest to their genuineness;

4) UnumProvident is a successor in interest to Paul Revere and Provident; (Tr. 741: 1–15)

5) Ralph Mohney was present throughout the time the documents were being created; (Tr.751:8–11)

6) The documents were authenticated by Mr. Parks in his deposition. (Tr. 751:11–14)

The court permitted Frank Caliri testify about the implications of many of the documents in determining the reasonableness of Defendants' claims handling policies. (Tr.102:9–16). An expert may rely on hearsay in forming an opinion. Evid.Code, § 801, subd. (b), 802; *Mosesian v. Pennwalt Corp.*, 191 Cal.App.3d 851, 860, 236 Cal.Rptr. 778, (1987); *Notrica v. State Compensation Ins. Fund* 70 Cal.App.4th 911, 933, 83 Cal.Rptr.2d 89 (1999)

*Conclusion re Provident documents:* The documents were relevant to the claims handling policies introduced by Ralph Mohney at Provident and taken with him to Paul Revere and applied to the handling of Plaintiff's claim. The documents were properly authenticated as business records and were in fact used at trial by Defendants.

**10) Defendants contend that the court improperly excluded evidence: testimony of Stephen Rutledge, Andrew O'Brien.**

■ Defendants offered Stephen Rutledge to testify that both the percentage of monthly individual disability claims that Paul Revere paid and Paul Revere's pay-outs for the individual disability line of business increased during the relevant time period. The court rejected his testimony on the grounds that it was too general, because statistics were for all individual disability claims, not just own-occupation individual disability claims. (Tr. 1584.)

■ Andrew O'Brien is a rehabilitation counselor and life care planner who would have testified regarding Plaintiff's ability to continue to work as a chiropractor with modifications to her practice. Plaintiff testified at trial that she primarily used manipulations, deep tissue massage and traction to treat her patients. Mr. O'Brien would have testified that Plaintiff could use a device called an activator[21] to treat her patients instead. The court excluded his testimony on the basis that he was not qualified to offer an expert opinion based on conversations with three chiropractors, and that his testimony was not relevant in light of the evidence in the record as to the usual and customary manner in which Plaintiff conducted her practice and that his testimony was more prejudicial than probative. (Tr. 1568–70).

---

**21.** Plaintiff testified that she formerly used the activator only in conjunction with other procedures, such as manual traction or myofascial release. In fact, using the activator aggravated her own symptoms (Tr. 480:11–16;481:10–17) She also testified that using the activator requires two hands, that she could not use it with her right hand without pain and that she could not use it at all with her left hand, because she wasn't left-handed and the position was wrong. (Tr. 505:11–506:2).

**1094**

**11) Defendants contend that the court's jury instruction and Plaintiff's argument and evidence for the definition of total disability were improper under California law.**

■■■ Total disability—Defendants claim that this court erred in instructing that a claimant must be unable to perform the important duties of her occupation in the usual and customary way with reasonable continuity. Defendants claim the court further erred in declining to instruct the jury that, to be totally disabled, an insured must be unable to perform all the important duties of her occupation.

The instruction given to the jury in the case at bar was:

### TOTAL DISABILITY

Plaintiff's policy defines "total disability" as follows:

"Total Disability" means that because of Injury or Sickness:

a. you are unable to perform the important duties of your Occupation; and

b. you are not engaged in any other gainful [22] occupation; and

c. you are under the regular and personal care of a physician. This means, according to the law in California, that plaintiff is eligible for benefits if she is unable to perform the substantial and material duties of her own occupation in the usual and customary way with reasonable continuity.

(Jury Instruction Number 36)

Plaintiff contends that the instruction correctly stated California law, which governs the policy. Furthermore, Defendants agreed to the instruction. Defendants' witness, Sandra Fryc, the UnumProvident nationwide Litigation Manager, testified that California's definition of total disability is being unable to perform the substantial and material duties of your own occupation in the usual and customary manner and with reasonable continuity, and that this definition of disability governs the policy's definition of disability, under the language of section 10.3, and that the policy is amended to meet the minimum requirements of state law. (Tr. 761:10–21). She also admitted that adjustors handling California claims should know the definition of disability for those policies, including the California Supreme Court rulings that could change the literal meaning of the disability definition in Paul Revere's policies. (Tr. 762:15–19; 764:2–9).

*Conclusion on definition of total disability:* Defendants are bound by the definition of total disability under California law, regardless of their own interpretation of the policy language.

**12) Defendants contend that Court's decision not to bifurcate punitive damages violated Defendants' right to due process.**

The court considered this issue in deciding Defendants' pretrial motion to bifurcate the issues of liability and punitive damages, which was denied.

Rule 42(b), Federal Rules of Civil Procedure, provides that the court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim,

---

**22.** Gainful—profitable, lucrative ( Webster's Unabridged Dictionary, 1996). Plaintiff testified that her chiropractic office failed after she became disabled and that her other business efforts were not successful. These included teaching and helping other chiropractors set up web sites. (Tr. 598:7–11) She could not put up the model web site due to conflicts with the web designer, who was also her fiancé, Mr. Decker. (Tr. 459:18–463:19) She couldn't hire someone else to complete the site because she had no more money and Mr. Decker claimed the rights to the web design. (Tr. 598:16–22).

counterclaim or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

The statute is intended to "further the parties' convenience, avoid delay and prejudice and serve the ends of justice." *9 Wright and Miller, Federal Practice and Procedure: Civil 2d,* § 2388 (1995). However, the court should cautiously apply the rule. "The piecemeal trial of separate issues in a single suit is not to be the usual course. It should be resorted to only in the exercise of informed discretion when the court believes that separation will achieve the purposes of the rule." *Id.*

The advisory note to § 2388 further explains that Rule 42(b) does not allow for bifurcation if the issues will be based on substantially the same facts. *Id.*

 In the case at bar, Defendants' financial condition and claims handling practices were relevant to their motive for terminating claims like Plaintiff's. The purpose of precluding evidence of a defendant's financial condition is to minimize prejudice prior to the jury's determination of a prima facie case of liability for punitive damages. However, such evidence is not to be excluded on the basis of prejudice when the information is relevant to liability. *Notrica v. State Compensation Ins. Fund,* 70 Cal.App.4th 911, 937–938, 83 Cal.Rptr.2d 89 (1999). (In an action for bad faith and unfair business practices against State Fund Insurance Company, insured was permitted by court to bring before the jury evidence of defendant's financial condition to place defendant's evidence in perspective.)

In the case at bar, Defendants have not shown how the evidence of their financial condition would prejudice the jury. To the contrary, the financial condition of the Defendants was relevant to liability. Plaintiff's claim for breach of contract was interwoven with her claim for bad faith. Evidence of the Defendants' profits, financial condition and financial statements helped establish Defendants' business strategies, incentives and practices, which were relevant to Plaintiff's claim for breach of contract.

*Conclusion re decision not to bifurcate punitive damages:* the basis for the award of punitive damages was inextricably linked with the evidence for liability. The Defendants' bad faith termination of Plaintiff's benefits was motivated by the desire of Defendants' managers to improve the companies' financial bottom line. In a trial for insurance bad faith it is reasonable and in fact necessary to try the issues of liability for contract damages and liability for punitive damages for tortious breach of that contract together before the same jury. It would have been a waste of time and resources to have separate trials on contract damages and punitive damages. **13) Defendants contend that the Damages awards are excessive. Emotional distress is grossly excessive, on its face and in comparison to prior awards in similar cases, both California and federal.**

The jury awarded Plaintiff $320,849 as the present value of Plaintiff's past disability benefits; and $1,200,000 as the present value of Plaintiff's future disability benefits.

 With respect to the awards for past and future unpaid benefits Plaintiff's expert, Christine Davis,[23] was qualified

---

**23.** Christine Davis is a Certified Public Accountant ("CPA") and has been since 1995. At the time of trial she was employed at

Hemming Morse in San Francisco. Hemming Morse is a CPA firm with 60 employees,

without objection (Tr. 785:8–14) and testified to the present value of Plaintiff's past and future unpaid policy benefits. She calculated Plaintiff's past benefits by using the monthly benefit in the insurance policy, $8150 per month, multiplied by the number of months of unpaid benefits, plus 10% interest as provided by Cal. Civ.Code section 3289. (Tr.788:17–789:24) The total value of Plaintiff's unpaid past policy benefits plus 10 percent interest would be $320,849. (Tr. 794:1–2)

■ She calculated the present value of Plaintiff's unpaid future policy benefits using a four-part system: the amount of the future benefit, the present value amount, the time frame between those two amounts and the growth rate required for the initial amount to increase to the future level. (Tr. 787:10–18). She set the future to commence in February 2002 and the end date at the year Plaintiff reaches the age of 82, which is her life expectancy, as derived from tables of the Department of Health and Human Services. (Tr. 790:3–11) She utilized an investment vehicle which was low risk and provided tax benefits, California municipal bonds, with a Triple A rating, with an interest rate of 3.5 percent. (Tr. 791:11–792:10) She calculated that the total future benefit payments would be $2,463,105. The present value of those payments, that is, the amount which would be invested in a low-risk, tax-advantaged investment such as California munic-

ipal bonds, to yield that amount would be $1,500,575. This is the present value of Plaintiff's future policy benefits. (Tr. 793:16–22).

If Plaintiff were owed benefits only to age 65, the amount of past unpaid benefits would remain the same, but the present value of future policy benefits would be reduced to $960,000. The total for past and future lifetime benefits would be $1,280,849 (Tr. 794:9–795:2).

The court finds that Plaintiff through her expert presented ample credible evidence of the present value of her past and future benefits.

■ The jury awarded Plaintiff $400,000 as damages for emotional distress. Plaintiff testified at trial about her humiliation at being forced along with her children onto welfare,[24] after having been a professional with her own practice. (Tr. 487:24—489:4, 492:3–25, 497:17–21). She also testified that she was concerned about her life and so anxious that her doctor prescribed anti-anxiety medication. One night she went to the hospital thinking she was having a heart attack, which turned out to be an anxiety attack. (Tr. 489:10–491:2). She attributed her anxiety to Defendants' having terminated her benefits. (Tr. 489:10) She was evicted from her house for nonpayment of rent and began to feel like a "bag lady." (Tr. 493:10–15) She testified that she wouldn't have had to

with additional offices in Fresno and Los Angeles. She is the Litigation Manager, which she described as a notch below director or partner. She studied accounting and graduated from Golden Gate University, and has worked for Burr, Pilger & Mayer, Coopers & Lybrand and as the subsidiary controller for a publicly held corporation. She is a member of the American Institute of Certified Public Accountants, and the California Society of Certified Public Accountants. She has worked on cases which involved analysis of the financial statements of insurance companies and to calculate those companies' net

worth. She has also attended a course in life insurance accounting and financial reporting.

24. Plaintiff testified that she receives $600 in cash aid per month, plus food stamps and Medi–Cal. Some months she receives less, if she has worked and earned money. She has sold some of her books and done consulting, and worked for a printer. She and her children live on $800–$1200 per month. (Tr. 495: 2–10) She applied for Social Security and State disability but is not totally disabled from any occupation and therefore does not qualify for those benefits. (Tr. 432:8–19).

go on welfare, declare bankruptcy, or be evicted if she had still been receiving her disability benefits from Defendants. (Tr. 494:10–18)

The damage awards for emotional distress in other California and federal cases are comparable to Plaintiff's. Larger awards for emotional distress have been upheld—$400,000 and more. *Clayton v. United Services Auto. Assn.* (1997) 54 Cal. App.4th 1158, 63 Cal.Rptr.2d 419 (upholding emotional distress award of $400,000 for insurance bad faith); *Tomaselli v. Transamerica Ins. Co.*, 25 Cal.App.4th 1269, 1286, 31 Cal.Rptr.2d 433 (1994); (upholding emotional distress award of $500,000).

Defendants claim they are being penalized for Plaintiff's financial losses due to bad investments.[25] Defendants cannot in fairness shift the blame for their wrongful actions to Plaintiff by citing her unwise investments as the cause of her damages.

■ Under California law, Defendants are responsible for injuries where their conduct was a substantial factor. Defendants seek to use a comparative fault analysis, but are barred from asserting comparative bad faith or any modification of their fault based on Plaintiff's conduct. *Kransco v. American Empire Surplus Lines Ins. Co.*, 23 Cal.4th 390, 97 Cal. Rptr.2d 151, 2 P.3d 1 (2000). Defendants did not seek a jury instruction on ordinary comparative fault. The jury impliedly found that Plaintiff could have weathered her own financial mismanagement but for Defendants' termination of her benefits.

*Conclusion on damage awards:* Plaintiff presented substantial evidence of her damages, both contractual and extra-contractu-al, including the loss of her income, and her emotional distress. The jury's awards were reasonable, under both California and federal law.

**14) Defendants contend that Punitive damages award of $5 million is grossly excessive— unconstitutional under the due process clause, and grossly excessive under California law.**

■ The jury awarded Plaintiff $5 million as punitive damages. This amount represents 0.1% of UnumProvident's net worth of $5 billion and 6.25% of Paul Revere's net worth of $800 million. The percentages are well within California's 10% of net worth standard for punitive damages. *Sierra Club Foundation v. Graham*, 72 Cal.App.4th 1135, 1163, 85 Cal. Rptr.2d 726 (1999); *Weeks v. Baker & McKenzie*, 63 Cal.App.4th 1128, 1166, 74 Cal.Rptr.2d 510 (1998). Some California courts have approved punitive damages awards representing 10–23% of defendants' net worth. *Vallbona v. Springer*, 43 Cal.App.4th 1525, 1539 n. 15, 51 Cal. Rptr.2d 311 (1996) (23.1%); *Sommer v. Gabor*, 40 Cal.App.4th 1455, 1464, 48 Cal. Rptr.2d 235 (1995) (7.25%); *Devlin v. Kearny Mesa AMC/Jeep/Renault, Inc.*, 155 Cal.App.3d, 381, 391, 202 Cal.Rptr. 204 (1984) (17.5%); *Wollersheim v. Church of Scientology*, 212 Cal.App.3d 872, 66 Cal. Rptr.2d 1 (1989) (12.5%); *Schomer v. Smidt*, 113 Cal.App.3d 828, 170 Cal.Rptr. 662 (1980) (10%).

The goal is to award an amount of punitive damages that is sufficient to deter the conduct but is not excessive. [1/10 of 1 percent of defendant's gross assets and less than a week's worth of its net income in 1974; held not excessive].

**25.** Plaintiff invested a total of $250,000 to $300,000, her retirement savings, in a dot-com company headed by her former fiancé, at the same time that she was purchasing a house, where her fiancé built a recording studio as part of his "Napster" style business. Plaintiff ultimately lost all her money and her house when the business failed. Plaintiff and her two children went to stay with her sister in Southern California (Tr. 451:7–456:3).

*Notrica v. State Compensation Ins. Fund* 70 Cal.App.4th 911, *952, 83 Cal. Rptr.2d 89 (1999). (citation omitted)

■ The ratio between compensatory and punitive damages is not overly significant. "The rule that the exemplary should bear a reasonable relation to the actual damages is only for the purpose of guarding against excess. [Citations.] But these cases also state that there is no fixed ratio by which to determine the proper proportion between the two classes of damages." (*Finney v. Lockhart* (1950) 35 Cal.2d 161, 164, 217 P.2d 19 [in defamation case, $2,000 in punitives, $1 award]; see also *Neal v. Farmers Ins. Exchange, supra,* 21 Cal.3d at 928–929, 582 P.2d 980 [$740,000 punitive damages award and about $10,000 in compensatory damages, a 74 to 1 ratio]; 952 *Downey Savings & Loan Assn. v. Ohio Casualty Ins. Co.* (1987) 189 Cal. App.3d 1072, 1097–1098, 234 Cal.Rptr. 835 [$5 million in punitive damages and $152,983.43 in compensatory damages, a ratio of 32.7 to 1]; *Chodos v. Insurance Co. of North America* (1981) 126 Cal. App.3d 86, 90, 103–104, 178 Cal.Rptr. 831, [$200,000 in punitive damages and $5,146.71 in compensatory damages, a ratio of about 40 to 1]; *Wetherbee v. United Ins. Co. of America* (1971) 18 Cal.App.3d 266, 270–271, 95 Cal.Rptr. 678 [$200,000 in punitive damages and $1,050 in compensatory damages, a ratio of about 190 to 1].) *Notrica v. State Compensation Ins. Fund* 70 Cal.App.4th 911, 951–952, 83 Cal. Rptr.2d 89 (Cal.App. 2 Dist.,1999)

In the case at bar the ratio of punitive damages ($5 million) to compensatory damages ($2.67 million) is less than 2:1, well under the ratios approved by California courts, *Neal,* supra, 21 Cal.3d at 928,

148 Cal.Rptr. 389, 582 P.2d 980 (affirming 74:1 ratio for insurer's bad faith); *Weeks,* supra, 63 Cal.App.4th at 1166, 74 Cal. Rptr.2d 510 (70:1); *Stevens v. Owens–Corning Fiberglas Corp.,* 49 Cal.App.4th 1645, 1651, 57 Cal.Rptr.2d 525 (1996) (80:1); *Leonardini v. Shell Oil Co.,* 216 Cal.App.3d 547, 555, 264 Cal.Rptr. 883 (1989) ($1 million punitives—25:1); *Ballou v. Master Properties No. 6,* 189 Cal.App.3d 65, 71, 234 Cal.Rptr. 264 (1987) ($2 million punitives—13:1).

*Conclusion regarding punitive damages:* The jury awarded $5 million as punitive damages. The jury had evidence of Defendants' net worth (over $5 billion for UnumProvident and $800 million for Paul Revere) and of the egregiousness of their conduct. (Targeting a particular category of claims for termination, subjecting their own insured to biased claims handling and withdrawing benefits rightfully due her, driving her into poverty).[26] A reasonable person could well conclude that the award of punitive damages was not excessive.

**15) Defendants assert that Plaintiff failed to establish entitlement to any award of attorney's fees.**

The jury awarded Plaintiff $750,000 for attorneys' fees. Defendants rely on the California Supreme Court decision in *Brandt v. Superior Court,* in which the court held that a successful plaintiff in an action against an insurance company may only receive an award of attorney's fees incurred to obtain the amount due under the policy. (Normally, each party to a civil action must bear his or her own legal fees (Ca Civ Pro § 1021).) However, fees reasonably incurred by an insured to enforce payment of benefits due under an insur-

**26.** Plaintiff filed bankruptcy October 3, 2000. (Tr. 469:20–22) Her two children were eligible for the free lunch program at school by September 2000. (Tr. 485:6–11, Ex. 93) The family has been receiving food stamps from June 2000 to July 2001 and from September 2001 until the time of trial. Plaintiff lost this benefit briefly by working and earning money. (Tr. 487:9–20).

ance policy—as distinguished from fees attributable to proving the insurer's "bad faith"—are recoverable damages in a "bad faith" action against the insurer. *Brandt v. Sup.Ct. (Standard Ins. Co.)* (1985) 37 Cal.3d 813, 817, 210 Cal.Rptr. 211, 693 P.2d 796. The court in the case at bar will look first at which benefits are due under Plaintiff's policy.

### Benefits Due

This court finds as a matter of law that in addition to past and future unpaid benefits, Plaintiff may recover under a theory of insurance bad faith for both emotional distress and future benefits as benefits recoverable under the policy. Furthermore, the court also finds as a matter of law that the jury may award attorney fees without an hourly itemization, but according to the reasonable value of the work performed to obtain Plaintiff's benefits due under the policy. The court reaches this conclusion based on the following decisions by other courts, both state and federal.

In *Crisci v. Security Ins. Co. of New Haven, Conn.*, 66 Cal.2d 425, 434, 58 Cal. Rptr. 13, 426 P.2d 173 (1967), the California Supreme Court unanimously upheld an award of emotional distress damages for breach of a liability insurance contract sounding in both contract and tort:

"(P)laintiff did not seek by the contract involved here to obtain a commercial advantage but to protect herself against the risks of accidental losses, including the mental distress which might follow from the losses. Among the considerations in purchasing liability insurance, as insurers are well aware, is the peace of mind and security it will provide in the event of an accidental loss, and recovery of damages for mental suffering has been permitted for breach of contracts which directly concern the comfort, happiness or personal esteem of

one of the parties. (*Chelini v. Nieri*, 32 Cal.2d 480, 482, 196 P.2d 915 (1948).)" *See Westervelt v. McCullough*, 68 Cal.App. 198, 228 P. 734 (1924).

Likewise, in *Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 404, 89 Cal.Rptr. 78 (1970), the above statement from *Crisci* was quoted with approval in the context of a disability insurance contract. The court elaborated as follows: "These considerations (the insured's peace of mind and security) are particularly cogent in disability insurance. The very risks insured against presuppose that if and when a claim is made, the insured will be disabled and in strait financial circumstances and, therefore, particularly vulnerable to oppressive tactics on the part of an economically powerful entity." *Kewin v. Massachusetts Mut. Life Ins. Co.* 409 Mich. 401, 442, 295 N.W.2d 50, 65 (Mich., 1980)

Accordingly, in the case at bar, this court finds that Plaintiff's peace of mind was a policy benefit, and that any efforts by her attorneys to obtain damages for her emotional distress caused by Defendants' bad faith termination of her policy benefits are compensable as incurred to obtain benefits due her under the policy.

With respect to Plaintiff's claim for future benefits, the court finds that these too are policy benefits, as stated previously in the section on Defendants' motion to exclude evidence on future benefits. Plaintiff complied with all the terms of her policy and Defendants did not; therefore, Plaintiff is entitled to all accrued benefits, including future benefits. Defendants would have the court find that Plaintiff must continue to reapply, year after year, in order to receive benefits. It would be unreasonable to require a claimant, whose insurance company has been proven to have acted in bad faith in the processing of her claim, to continue to subject herself to

the same illegitimate process in order to continue to receive benefits.

### Amount of Fee Award

The primary authority the court looks to for allocation of an award of attorney fees in an insurance bad faith case is the decision of the California Supreme Court in *Brandt.*

> When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort. These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action.

> Code of Civil Procedure section 1021 does not preclude an award of attorney's fees under these circumstances. "Section 1021 leaves to the agreement of the parties 'the measure and mode of compensation of attorneys.'" However, here, as in the third party tort situation, 'we are not dealing with "the measure and mode of compensation of attorneys" but with damages wrongfully caused by defendant's improper actions.' In such cases there is no recovery of attorney's fees *qua* attorney's fees. This is also true in actions for false arrest and malicious prosecution, where damages may include attorney's fees incurred to obtain release from confinement or dismissal of the unjustified charges.

> "When the insurer's conduct is unreasonable, a plaintiff is allowed to recover for all detriment proximately resulting from the insurer's bad faith, which detri-

ment *Mustachio* has correctly held includes those attorney's fees that were incurred to obtain the policy benefits and that would not have been incurred but for the insurer's tortious conduct." The fees recoverable, however, may not exceed the amount attributable to the attorney's efforts to obtain the rejected payment due on the insurance contract. Fees attributable to obtaining any portion of the plaintiff's award which exceeds the amount due under the policy are not recoverable.

*Brandt v. Superior Court* 37 Cal.3d 813, 817, 819, 210 Cal.Rptr. 211, 693 P.2d 796 (1985) (internal citations and footnotes omitted)

**Defendants contend that Plaintiff's attorneys must provide an hourly breakdown of their work on her case.**

 In their memo re Plaintiff's claim for attorneys' fees, filed September 14, 2001, Defendants cited the unpublished decision by the district court in *Reed v. Scottsdale Ins. Co.*, 1998 U.S.Dist. Lexis 4254 at *4 (N.D.Cal.1998). In that case, the court denied attorney's fees because the plaintiff could not segregate *Brandt* fees hour by hour. The court required counsel to submit a list of itemized hours worked on the particular issues involved. Defendants in the case at bar seek to nullify the jury's award of attorney fees because there is no hourly itemization.

This court disagrees with Defendants' interpretation of the holding in *Brandt.* A more recent case has dealt with this same question: whether there need be an hourly itemization of the attorney fees for an award to be upheld. Although in this case the court rather than the jury awarded the fees, there is no reason its decision should not apply to a jury verdict as well:

> Trial court could allocate attorney fees in a bad faith suit based on its determi-

nation of the reasonable value of services expended by loss payee's attorneys to obtain benefits due under property insurance policy; the court could thus limit payee's award to $80,000 out of $143,458 allegedly expended to compel payment of policy benefits, although it could not segregate the billing between recoverable amounts for enforcing the contract and unrecoverable amounts for proving bad faith. *Track Mortg. Group, Inc. v. Crusader Ins. Co.,* 98 Cal.App.4th 857, 120 Cal.Rptr.2d 228 (2002)

In the case at bar, this court carefully considered the instruction to be given to the jury, which as the fact-finder, was charged with allocating any award of attorney's fees, since fees would be awarded as part of Plaintiff's damages and the parties did not stipulate otherwise. The court followed the recommendation of the California Supreme Court in the *Brandt* case to the letter:

> If, however, the matter is to be presented to the jury, the court should instruct along the following lines: "If you find (1) that the plaintiff is entitled to recover on his cause of action for breach of the implied covenant of good faith and fair dealing, and (2) that because of such breach it was reasonably necessary for the plaintiff to employ the services of an attorney to collect the benefits due under the policy, then and only then is the plaintiff entitled to an award for attorney's fees incurred to obtain the policy benefits, which award must not include attorney's fees incurred to recover any other portion of the verdict." *Brandt v. Superior Court* 37 Cal.3d 813, 819, 210 Cal.Rptr. 211, 693 P.2d 796 (1985)

In the case at bar, the jury was instructed as follows on attorneys' fees:

### No. 63
### DAMAGES—ATTORNEYS' FEES

If you find (1) that plaintiff is entitled to recover on her cause of action for breach of the implied covenant of good faith and fair dealing, and (2) that because of such breach, it was reasonably necessary for the plaintiff to employ the services of her attorney to collect the benefits due under the policy, then and only then is the plaintiff entitled to an award of reasonable attorney's fees incurred to obtain the past and current policy benefits. This award must not include attorney's fees incurred to recover other portions of the verdict.

This is the precise language recommended by the California Supreme Court in the *Brandt* case. Accordingly, the court finds that the jury was properly instructed, and it infers that the jury awarded attorney's fees solely for the recovery of the benefits due plaintiff under the policy, including fees incurred for counsels' efforts to obtain both future benefits and damages for emotional distress. Plaintiff's total damages for past and future benefits and emotional distress were $1,920,849, of which 40%, representing the contingent fee agreed to by Plaintiff and her counsel, is $768,339.60. (Ex.101). The jury's award of $750,000 is slightly less than this. Therefore, the fee should not be reduced.

*Conclusion regarding attorney's fees:* The jury awarded Plaintiff $750,000 as damages for attorney's fees. The jury was properly instructed to award fees only for efforts to obtain benefits due to plaintiff under her policy. The award should be upheld.

### SUMMARY OF CONCLUSIONS

*Conclusion re breach of contract—* Defendants breached their contract with plaintiff to pay her benefits if she became disabled from working at her own occupation.

*Conclusion regarding existence of a genuine dispute—* The evidence is overwhelming that Paul Revere intended to terminate claims such as Plaintiff's and

that in fact her claim had been taken to a round table on more than one occasion with the intent to find a way to terminate her benefits.

*Conclusion re Paul Revere's thorough and unbiased investigation*— All of the company's efforts, including the surveillance, begun even before anyone had reviewed plaintiff's medical records, were undertaken with the goal of terminating her benefits.

*Conclusion re jury award of punitive damages*— The jury heard ample evidence in support of this award— the round tables, the use of a biased medical examiner, failing to advise plaintiff of benefits to which she was entitled, and terminating her benefits when she was totally disabled.

*Conclusion on future benefits*— If Plaintiff has at all times complied with the terms of the policy and Defendants in bad faith breached their obligation under those terms, then Plaintiff is entitled to all benefits which have accrued, including future benefits.

*Conclusion re Frank Caliri*— This court found him qualified by training and experience to testify as an expert on insurance industry practices and standards, but not to render an opinion on the ultimate issues in the case.

*Conclusion regarding deposition of Dr. Feist*— This deposition came under the hearsay exception since the witness was unavailable and had been subject to cross-examination by the co-defendant in the previous action also a Defendant in the case at bar. He was not offered as an expert but as a percipient witness to Defendants' claims handling practices and general policies. Defendants had notice that Dr. Feist was a potential witness.

*Conclusions re excluded defense witnesses*— Stephen Rutledge was offered to testify that the percentage of monthly individual disability claims that Paul Revere paid and that Paul Revere's pay-outs for the individual disability line of business increased during the relevant time period. The court rejected his testimony on the grounds that it was too general, perhaps because statistics were for all individual disability claims, not just own occupation individual disability claims. Andrew O'Brien was not qualified to offer an expert opinion based on conversations with three chiropractors, and his testimony was not relevant in light of the evidence in the record as to the usual and customary manner in which Plaintiff conducted her practice and that his testimony was more prejudicial than probative.

*Conclusion on definition of total disability*— Defendants are bound by the definition of total disability under California law, regardless of their own interpretation of the policy language.

*Conclusion re decision not to bifurcate punitive damages*— the basis for a finding of punitive damages was inextricably linked to the evidence as to liability— bad faith motivated by the desire of Defendants' managers to improve the companies' financial bottom line. It would have been a waste of time and resources to have separate trials on liability, damages and punitive damages.

*Conclusion on damage awards*— Plaintiff presented ample evidence of her damages, both contractual and extra-contractual, including the loss of her income, and her emotional distress. Other California and federal cases are comparable.

*Conclusion regarding punitive damages*— The jury had evidence of Defendants' net worth (over $5 billion and over $800 million respectively) and of the egregiousness of their conduct. (Targeting a particular category of claims for termination, subjecting their own insured to biased claims handling and withdrawing ben-

efits rightfully due her, driving her into poverty). Put those together and a reasonable person could conclude the award of punitive damages was not excessive.

*Conclusion regarding attorney's fees*— The jury was properly instructed and the award should be upheld.

For all the above reasons, Defendants' motion for judgment as a matter of law or for new trial is denied.

## CLAIM FOR VIOLATION OF UNFAIR COMPETITION ACT

Plaintiff moves for findings of fact, conclusions of law and an equitable remedy for Defendants' alleged violation of California Business and Professions Code § 17200, the Unfair Business Practices Act or Unfair Competition Act ("UCA") or Unfair Competition Law ("UCL"). Earlier in this case, on a motion for leave to amend which was granted, Plaintiff proposed to add this cause of action and seek the following remedy:

On behalf of the general public, and of law-abiding insurance companies who have suffered unfair competition, seeking no damages on her own behalf, Plaintiff asked the court to order:

1) injunctive relief, in the form of an injunction against defendants' continuing to engage in the unlawful conduct;

2) that defendants be ordered to re-open claims filed by its insureds with "own occupation" disability policies where the complained-of practices were employed, with notice to the insureds and review, reprocessing and reevaluation of their claims;

3) restoration of all monies illegally obtained in the form of premiums for these policies;

4) any equitable relief deemed appropriate by the court;

5) reasonable attorneys' fees.

## Defendants' Earlier Opposition to § 17200 Claim

Plaintiff previously moved for leave to amend her complaint in the case at bar to add a cause of action for unfair business practices in light of deposition testimony taken in July 2001 in a state court case, *United Policyholders, et. al. v Provident et al.*, Alameda County Superior Court, Case No. 815688–2. (See Memorandum of Points and Authorities and Declaration of Alice Wolfson in Support of Plaintiff's Motion to Amend.) These exhibits tend to show that when Provident acquired Paul Revere, as part of the transition, Paul Revere employees implemented Provident's policies for handling claims, as complained of in this lawsuit; such as targeting certain types of claims for termination. (See Ex. Q to Confidential Declaration of Alice Wolfson in Support of Motion to File Amended Complaint—Transition Plan).

Defendants developed risk profiles of targeted claims and claimants based on the following factors:

1) Higher amounts of income of insured;
2) Existence of residual or COLA riders;
3) Longer benefit period;
4) Shorter elimination period;
5) 1983 to 1989 issue;
6) California and Florida;
7) Certain occupations.

(Ex. H to Memorandum of Points and Authorities in support of motion to file amended complaint).

Defendants opposed amendment of the complaint on grounds that it would be futile, since they contend there is no private right of action under the Unfair Insurance Practice Act ("UIPA"), Insurance Code, § 790 *et seq.*, and Plaintiff is attempting to use a claim under the Unfair Business Practices Act, (Business and Professions Code § 17200), to make an end

run around this prohibition. Defendants also claim that Plaintiff's allegations in support of this cause of action are untrue, and that the injunctive relief sought by Plaintiff is not available as a matter of law.

However, Defendants' own documents show that it did indeed target certain categories of claims for closer scrutiny, for instance doctors in Florida and California. (See Exs. E, F, G and H to Plaintiff's Memorandum of Points and Authorities in Support of Motion to Amend). Paragraphs 26 through 28 of the amended complaint allege that Provident's Senior Vice President of Claims, Raiph Mohney, on behalf of Provident itself, implemented various initiatives in order to deny unfairly the claims of its insureds. Plaintiffs alleged such practices as keeping information out of the written reports if it could prove damaging to Defendants in the event of legal action (See *Id.*, Exs. I, J and K). Defendants assert that these allegations are untrue.

Plaintiff contends that UnumProvident's wholly owned subsidiary GenEx (Ex. 59) sent out the IME referral letter referring Plaintiff in the case at bar to Dr. Swartz. This letter, by stating an opinion by Dr. Bianchi regarding Plaintiff's medical condition, violated Defendants' own standards. (Tr. 294:14–295:17, Ex. 28). Defendants chose physicians who would find claimants to be not disabled, failed to instruct physicians regarding the appropriate definitions of disability, and destroyed medical records. (See Plaintiff's Memo of Points & Authorities in Support of Motion to Amend, Ex. M). Plaintiff in the case at bar alleged that these, among other policies and practices, constitute bad faith, and the jury agreed with her.

Defendants cite the California case of *Safeco Ins. Co. v. Superior Court,* 216 Cal.App.3d 1491, 1494, 265 Cal.Rptr. 585 (1990) and its interpretation of *Moradi–Shalal v. Fireman's Fund Ins. Compa-*

*nies,* 46 Cal.3d 287, 304, 250 Cal.Rptr. 116, 758 P.2d 58 (1988), to foreclose a cause of action under § 17200 as a sham substitute for a private right of action for violations of Insurance Code § 790 *et seq.* Defendants contend that there is an absolute bar against private enforcement of this section. In *Safeco* the court held that a motorcyclist who settled with an insured driver after an accident could not bring a private cause of action against the insurance company for failure to pay premiums. The *Safeco* opinion, however, is extremely brief, conclusory and involves a third-party lawsuit by an injured person against the insurer of the person who injured him. These factors distinguish it from the case at bar, which involves a suit by the insured against her own insurance company.

In *Moradi–Shalal,* both the facts and the applicable law are distinguishable. That case involved a third-party action brought by an injured person, who first settled her case against the driver and then sued the insurance company. The court decided only that § 790.09 of the UIPA did not provide a private right of action against the insurer for violation of the UIPA. The court did permit common law causes of action in tort but did not consider the availability of an action under § 17200 of the Bus. & Prof.Code.

Defendants also cite the case of *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.,* 17 Cal.4th 553, 556, 71 Cal.Rptr.2d 731, 950 P.2d 1086 (1998), for the proposition that there is no cause of action available under § 17200 if the underlying statute does not authorize a private right of action. However, in a lengthy and well-reasoned opinion, the court directly contradicts Defendant's position. In that case, a nonprofit corporation sued retailers for selling cigarettes to minors in violation of California Penal Code § 308, which does not authorize a private cause of action.

The trial court sustained the retailer's demurrer, the court of appeal reversed and the California Supreme Court affirmed the decision of the Court of Appeal.

The court, reasoned as follows: (1) the nonprofit corporation had standing under the Unfair Competition Law ("UCL") to bring a private action, although Penal Code section 308 provision which was a predicate for the UCL action did not provide a private right of action; (2) private-party standing under the UCL was not impliedly repealed by the Penal Code provision prohibiting tobacco sales to minors or by the Stop Tobacco Access to Kids Enforcement (STAKE) Act; and (3) a private action did not violate public policy by putting prosecutorial discretion within the control of an interested party or by diminishing the enforcement responsibilities of the Department of Health Services (DHS) under the STAKE Act.)

Thus, in a much more detailed and thoughtful decision, the California Supreme Court has allowed a private right of action under § 17200, even if the underlying statute does not expressly authorize it, as long as the statute does not explicitly bar it.

The Unfair Insurance Practices Act ("UIPA"), lists a number of prohibited acts at § 790.03 and the remedies at § 790.09. Plaintiff in the case at bar accuses Defendants of many of them.

Contrary to the assertions of Defendants, the remedies for violating any of the provisions of § 790.03 are not limited to administrative action, as stated in the plain language of § 790.09 itself:

No order to cease and desist issued under this article directed to any person or subsequent administrative or judicial proceeding to enforce the same shall in any way relieve or absolve such person from any administrative action against the license or certificate of such person, civil liability or criminal penalty under the laws of this State arising out of the methods, acts or practices found unfair or deceptive.

Cal. Insurance Code § 790.09

Consequently, in accordance with the court's reasoning in *Stop Youth Addiction*, civil liability is expressly reserved in the insurance statute which Plaintiff claims Defendants have violated, and a private cause of action is available to her under § 17200 for any alleged unfair business practices by Defendants.

The holding of the California Supreme Court in *Stop Youth Addiction* has also been adopted by the U.S. Court of Appeals for the Ninth Circuit, which held that a private right of action for violation of an insurance regulation is available in federal court under Cal. Business and Professions Code § 17200. In *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042 (9th Cir.2000), plaintiff sued for violation of both the Americans with Disabilities Act and California Insurance Code § 10144, after an insurance company charged him nearly double the usual life insurance premium on the basis of a medical condition which would actuarially shorten his life by four years.

The court held that he could also bring a cause of action for violation of Business & Professions Code § 17200:

Chabner, however, also claimed violations of California Business and Professions Code section 17200. Section 17200 is part of the Unfair Competition Law, Cal. Bus. & Prof.Code 17200—17209, and provides, in relevant part, that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice."

Private causes of action for violations of Business and Professions Code section 17200 are authorized by Business and Professions Code section 17204. The district court held that Insurance Code

section 10144 may be used to define the contours of a private cause of action under Business and Professions Code section 17200. We agree.

The California Supreme Court has held that section 17200 "defines 'unfair competition' very broadly, to include 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" "By proscribing 'any unlawful' business practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." It does not matter whether the underlying statute also provides for a private cause of action; section 17200 can form the basis for a private cause of action even if the predicate statute does not.

There are limits on the causes of action that can be maintained under section 17200. A court may not allow a plaintiff to "plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." The limit is rather narrow, however. "To forestall an action under [section 17200], another provision must actually 'bar' the action or clearly permit the conduct."

*Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042 (9th Cir.2000)(internal citations omitted)

In light of the decisions of the California Supreme Court in *Stop Youth Addiction* and the Ninth Circuit in *Chabner*, a cause of action for violations of § 790.09 of the UIPA may be asserted under § 17200 of the Unfair Competition Law by plaintiff in the case at bar. Section 790.09 expressly provides that an administrative action does not immunize a defendant from either civil or criminal liability. Consequently, the court in the case at bar ruled that this amendment to plaintiff's complaint to add a cause of action under the UCL was not improper.

■ Parenthetically, in response to Defendants' assertion that injunctive relief is not available to plaintiff in this case pursuant to § 17200, this court reiterates its previous ruling in another case: as a matter of law, California's Bus. & Prof. Code § 17200 provides for both disgorgement of profits and injunctive relief. *Irwin v. Mascott*, 112 F.Supp.2d 937 (N.D.Cal.2000).

## APPLICABLE LAW

Under the Unfair Competition Act (UCA) definition of "competition," to mean and include "*any* unlawful, unfair or fraudulent business *act or* practice," liability can be based on a single transaction and does not require a showing of ongoing wrongful business conduct. West's Ann.Cal.Bus. & Prof.Code §§ 17200. *Klein v. Earth Elements, Inc.*, 59 Cal.App.4th 965, 69 Cal. Rptr.2d 623 (1997).

Prior to the 1992 amendment to the UCA, which added the emphasized words, section 17200 was construed as directed at ongoing wrongful business conduct, something beyond a single transaction. *State of California ex rel. Van de Kamp v. Texaco, Inc.*, 46 Cal.3d 1147, 1169–1170, 252 Cal. Rptr. 221, 762 P.2d 385 (1988).

According to recent authority, all that changed when two three-letter words— "any" and "act" were added. (*Podolsky v. First Healthcare Corp.* 50 Cal.App.4th 632, 653–654, 58 Cal.Rptr.2d 89 (1996); Antitrust and Trade Regulation Law Section of the State Bar of California, Cal. Antitrust Law (Supp.1994). (*Cited in Klein v. Earth Elements, Inc.* 59 Cal.App.4th 965, 969, 69 Cal.Rptr.2d 623 (1997).

■ In proving an Unfair Business Practice violation, claimants are entitled to introduce evidence not only of practices

which affect them individually, but also similar practices involving other members of the public who are not parties to the action. (*Perdue v. Crocker National Bank* 38 Cal.3d 913, 929, 216 Cal.Rptr. 345, 702 P.2d 503 (1985); *Consumers Union of United States, Inc. v. Fisher Development, Inc.,* 208 Cal.App.3d 1433, 1441–1442, 257 Cal.Rptr. 151 (1989); *Hernandez v. Atlantic Finance Co.,* 105 Cal.App.3d 65, 72, 164 Cal.Rptr. 279, (1980) (Without the unfair business practices claim, the trial court restricted the scope of the evidence introduced at trial to that directly relevant to each individual plaintiff. Consequently, the case must be remanded for retrial of this claim.) *Cisneros v. U.D. Registry, Inc.* 39 Cal.App.4th 548, 564, 46 Cal. Rptr.2d 233 (1995).

The Unfair Insurance Practices Act ("UIPA"), lists a number of prohibited acts at § 790.03 and the remedies at § 790.09.

A partial list of prohibited acts which have been complained of in the case at bar includes the following:

"(h) Knowingly committing or performing with such frequency as to indicate a general business practice any of the following unfair claims settlement practices:

(1) Misrepresenting to claimants pertinent facts or insurance policy provisions relating to any coverages at issue.

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies.

(3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies.

(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured.

(5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

(13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement".

Cal. Insurance Code § 790.03

■ In the case at bar, the evidence was substantial that Defendants engaged in several violations of provisions (1), (3), and (5).

With respect to provision (1):

Plaintiff's expert, Frank Caliri, testified that Paul Revere misrepresented the benefits available to plaintiff, by not informing her about recovery benefits, residual benefits or rehabilitation benefits and telling her in their denial letter that her policy was subject to ERISA, when it wasn't.

A recovery benefit is provided in the policy if, prior to age 65, an insured is engaged in any occupation immediately after a period of disability for which benefits were paid and incurs a loss of earnings equal to at least 20% of prior earnings. This does not require disability or being under the care of a physician.

Residual disability benefits are provided in the policy if the insured is unable to perform one or more of the important duties of her occupation; is unable to perform the important duties of her occupation for more than 80% of the time normally required to perform them; or her loss of earnings is equal to at least 20% of her former earnings while engaged in her occupation or another occupation; and she is under the regular and personal care of a physician. Mr. Caliri testified that Defendants' termination letter to Plaintiff wrongly advised her that she was not eligible for this benefit.

While an insured is receiving total disability benefits, she may choose to join a vocational rehabilitation program, during which she may receive benefits for 36 months without being under the care of a physician, in order to be retrained in another occupation. There was nothing in the claim file to indicate that Plaintiff was offered this covered benefit. Mr. Caliri testified that failing to inform an insured of a covered benefit fell below industry standards.

With respect to provision (3), there was testimony from Frank Caliri and Dr. Feist that Defendants targeted claims for termination when they fit a certain profile and that Plaintiff's claim fit that profile: she was a professional, with an own occupation policy, receiving a high benefit amount, who received benefits for a number of months. Defendants' claims personnel took "problem claims" to the round table process, where they were examined for ways to terminate them. Defendants' claims personnel took Plaintiff's claim to a round table soon after she began receiving benefits, and several times thereafter until her benefits were terminated.

Defendants also sent Plaintiff to a biased medical examiner, Dr. Swartz, after sending a referral letter to him from Dr. Bianchi, which expressed the opinion that Plaintiff's condition would improve with conservative treatment over time, in effect directing Dr. Swartz to the conclusion he should reach before he ever saw Plaintiff.

With respect to provision (5), Defendants engaged in practices designed to conceal their decision-making process and make it more difficult for an insured to obtain information to help resolve a claim.

At trial, Mr. Caliri testified that the practice described in Exhibit 45 fell below insurance industry standards. That document is a directive from the Law Department of Provident Life & Accident Insurance Co. instructing claims adjusters to

"shred all sensitive papers that will not be needed for business purposes." (Tr. 69:11–24, Ex. 45) The document also instructed claims adjusters to communicate in person rather than on paper regarding sensitive matters. In his opinion this was also below the industry standard which is to document the status of a claims file. (Tr. 70:21–71:6) Mr. Caliri also testified that in an internal Provident memorandum dated February 21, 1996, field managers were directed not to include recommendations or conclusions regarding claims in their written reports. Instead they were instructed to communicate them verbally or in a separate memo. He testified that this practice was below the standard of care in the insurance industry, which requires that decisions be documented in the claims file. (Tr. 71:15–72:8, 215:13–24, 216:6–12)

There was some discussion during cross-examination of Mr. Caliri of which documents needed to be retained in the claim file, either by insurance regulations or company policy. Defendants' counsel read a passage from a Provident Document (Exhibit 45). This stated "Retain only those documents needed for operations, legal compliance, and official archives." Mr. Caliri referred to an additional passage which admonished Provident employees as follows: "Shred all sensitive papers that will not be needed for business purposes. Generally when copies of certain legal-type documents are sent to you for informational purposes, these documents should be shredded after you've read them. These may be documents prepared for lawsuits and reports of investigations or legal audits, memos, responses, or reports from the Law Department involving actual facts about the company businesses or legal situations." (Tr. 220:1–8)

Mr. Caliri testified that it was below the insurance industry standards to shred doc-

uments which had been prepared for reports and investigations and lawsuits. (Tr. 219:12–220:14) This section governed which documents the company wanted to be shredded or otherwise destroyed, a separate issue from that of the policy to avoid creating documents in the first place. Mr. Caliri conceded that it was reasonable for Provident to instruct its employees to retain those documents needed for legal compliance. (Tr. 221:6–9).

Dr. Feist testified as well, based on his years as a medical director in the insurance industry, including many years at Provident, prior to Ralph Mohney's advent, that if an insurance company is fairly adjudicating claims, all documentation of data and decisions should be in the claims file and not be purged. If data which does not support the insurance company's decision regarding the claim was purged, that would be dishonest. (Tr. 813:8–814:3) In his opinion the practices described in the document entitled "Outline for Information Management" presented by the Law Department of Provident Life & Accident Insurance Co. were wrong. These included avoiding written communications about sensitive subjects and shredding sensitive papers. (Tr. 816:2–10) Dr. Feist testified that before Chandler and Mohney came to Provident, claims were handled in a fair and aboveboard way, but that after their arrival, standards slid to those which were not ethical for an insurance company. (Tr. 817:14–23)

Mr. Caliri also expressed the opinion that Defendants violated industry standards when they initiated surveillance of Plaintiff prior to receiving all of her medical records. He testified that the purpose of surveillance was to determine whether there was a discrepancy between a claimant's activities and something in the file. (Tr. 72:20–73:14) Defendants initiated surveillance before there was much of anything to document in the file.

## CONCLUSION AND ORDER

There was testimony at trial that Paul Revere adopted Provident's claims handling policies as part of the transition when it was acquired by Provident, including targeting certain categories of claims, and that Paul Revere employees admitted to such practices as destruction of the original medical reports from examining physicians, not knowing the California definition of total disability, and adopting a policy of failing to document claims processes in the file. There was testimony from experts and others that Defendants used a biased medical examiner, failed to advise its insured of covered benefits, targeted claims like hers for termination, failed to settle a claim when liability was clear, and forced its insured to litigate to obtain benefits. Based on the evidence presented at trial, this court concludes that Defendants have violated the Unfair Insurance Practices Act, Insurance Code § 790.03, and that their bad faith in doing so, as found by the jury in this case, constitutes a violation of Cal. Bus. & Prof. Code § 17200.

The court hereby adopts the factual finding of the jury that the Defendants acted in bad faith in denying Plaintiff's claim and further finds that the Defendants' multiple acts of bad faith constitute violations of the California Unfair Competition Act.

The court exercises its discretion in seeking to fashion an appropriate equitable remedy.

■ In bringing her cause of action under section 17200, Joan Hangarter asked this court to order Defendants to desist from unfair practices directed both at her and other policyholders, and to award her attorney fees and to provide other relief, including reopening investigations of other claims, refunding premiums and such other relief as the court found proper. After the trial on Plaintiff's other

causes of action, the jury awarded Plaintiff substantial damages for her past and future monthly benefits, her emotional distress, her attorney's fees and punitive damages. In so doing the jury sent a significant message to the Defendants. This court sees no need to supplement the jury's award. The court also finds it impracticable to fashion a consent decree or to *sua sponte* open an investigation into allegations by other policyholders. The court finds it more appropriate in this instance to order Defendants to obey the law, and hereby enjoins them from future violations, including but not limited to, targeting categories of claims or claimants, employing biased medical examiners, destroying medical reports, and withholding from claimants information about their benefits.

IT IS SO ORDERED.